PUBLISHED

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

WACHOVIA BANK, NATIONAL
ASSOCIATION,

*Plaintiff-Appellant,*

v.

DANIEL G. SCHMIDT, III; PRIAG LLC;
DGS INVESTMENTS, INC.,

*Defendants-Appellees.*

No. 03-2061

OFFICE OF THE COMPTROLLER OF THE
CURRENCY,

*Amicus Supporting Appellant.*

On Remand from the Supreme Court of the United States.
(S. Ct. No. 04-1186)

Submitted: February 21, 2006

Decided: April 25, 2006

Before LUTTIG and KING, Circuit Judges, and
Robert R. BEEZER, Senior Circuit Judge of the
United States Court of Appeals for the Ninth Circuit,
sitting by designation.

Affirmed by published opinion. Judge King wrote the opinion, in
which Judge Luttig and Senior Judge Beezer joined.

## COUNSEL

Robert W. Fuller, III, Stephen M. Cox, ROBINSON, BRADSHAW
& HINSON, P.A., Charlotte, North Carolina, for Appellant. James R.

Gilreath, Greenville, South Carolina; John P. Freeman, Columbia, South Carolina; T. English McCutchen, III, L. Susan Foxworth, McCUTCHEN BLANTON JOHNSON & BARNETTE, LLP, Columbia, South Carolina, for Appellees. Daniel P. Stipano, Horace G. Sneed, Larry J. Stein, OFFICE OF THE COMPTROLLER OF THE CURRENCY, Washington, D.C., for Amicus Supporting Appellant.

---

**OPINION**

KING, Circuit Judge:

In June 2003, Daniel G. Schmidt, III, Priag LLC, and DGS Investments, Inc. (together, the "Schmidt Defendants"), filed a civil action in the Court of Common Pleas of Greenville County, South Carolina, asserting that Wachovia Bank, National Association, and others had wrongfully induced them to participate in an illegitimate tax shelter. Soon thereafter, Wachovia filed a separate petition in the District of South Carolina, seeking to compel the Schmidt Defendants to arbitrate their state-court claims against Wachovia under the arbitration clauses found in two separate agreements to which Schmidt was a party. By its order of August 1, 2003, the district court denied Wachovia's petition to compel arbitration. *See Wachovia Bank, N.A. v. Schmidt*, CA-03-2005-6-20 (D.S.C. Aug. 1, 2003) (the "Order"). Wachovia has appealed from the Order and, as explained below, we affirm.

I.

In May 1998, Schmidt incurred a very substantial capital gain through the sale in South Carolina of his physical therapy businesses. Soon thereafter, representatives of Wachovia approached Schmidt and advised him of a potentially advantageous investment strategy involving KPMG LLP, and QA Investments, LLC ("Quadra").[1] His interest

---

[1]Although at all relevant times the Schmidt Defendants dealt with First Union National Bank, we refer to First Union as Wachovia, First Union's successor by virtue of a 2001 merger.

piqued, Schmidt soon thereafter attended a meeting conducted by representatives of Wachovia, KPMG, and Quadra. At that meeting, Schmidt was informed that the investment strategy, called a Foreign Leveraged Investment Program, i.e., a FLIP, involved highly leveraged investments in stock of the United Bank of Switzerland (the "UBS FLIP"). He was advised at the meeting that the UBS FLIP was a "slam dunk" — not only would the investors enjoy substantial profits, but the investment strategy would provide a so-called "basis shift," which would serve to shelter from federal taxation the capital gains Schmidt had made in the sale of his businesses. Wachovia, KPMG, and Quadra assured Schmidt that the UBS FLIP strictly complied with the rules and regulations of the Internal Revenue Service (the "IRS"). According to the Schmidt Defendants' state-court complaint, however, Wachovia, KPMG, and Quadra knew or should have known that the IRS was likely to oppose the use of the UBS FLIP as a tax shelter.

At some point, Schmidt decided to participate in the UBS FLIP and created defendant Priag LLC to carry out the necessary transactions.[2] Wachovia's role in the UBS FLIP was to provide financial advice concerning the investments. KPMG (a major accounting firm), on the other hand, was to provide tax planning services and prepare Schmidt's tax returns, while Quadra was to control and direct the investments. The UBS FLIP was comprised of both direct and indirect purchases of UBS stock. The indirect purchases were accomplished through the purchase of a warrant in the stock of Sandpiper Capital, Inc., a Cayman Islands company which had previously made leveraged purchases of UBS stock.

Wachovia's role as Schmidt's financial advisor concerning the UBS FLIP was formalized on September 10, 1998, in a Financial Advisory Services Contract between Wachovia and Schmidt under which Schmidt paid Wachovia $100,000 for its services. Later, on September 21, 1998, Wachovia loaned Schmidt $3.5 million for his use in connection with the UBS FLIP, in exchange for a promissory

---

[2]Schmidt formed Priag LLC on the advice of either KPMG or Quadra. He owns ninety-eight percent of Priag, and defendant DGS Investments owns the remaining two percent.

note executed by Schmidt to Wachovia (the "Note").[3] The Note contained an arbitration clause providing that either party could compel arbitration of "any claim or controversy arising out of, or relating to" the Note or other documents executed in connection with the loan.[4] Schmidt fully satisfied the Note, by payment of the principal and interest, sometime in 1999, and the Note was thereafter cancelled.

The investments comprising the UBS FLIP were directed by Quadra, for whose services Schmidt paid $1.75 million. As relevant here, Quadra arranged for Schmidt to purchase a warrant from Sandpiper for eighty-five percent of Sandpiper's stock (the "Warrant"). The Warrant was issued on September 24, 1998, and included a provision requiring arbitration of "[a]ny dispute, controversy or claim arising out of or relating to" the Warrant. Schmidt ultimately executed the Warrant, through what was called an "election to put," on December 23, 1998.

The UBS FLIP was apparently a disaster all the way around. Not only did the investment fare poorly as a profit-generating enterprise, but its use as a tax shelter caught the attention of the IRS. On July 26, 2001, the IRS issued its Notice 2001-45, advising that "Basis Shifting Tax Shelters" could be subject to disallowance for tax purposes, interest on unpaid taxes, and potentially penalties as well. At the time Wachovia took this appeal, the Schmidt Defendants were engaged in negotiations on the matter with the IRS and expected to be liable for back taxes in excess of $3 million, in addition to interest and possible penalties.

The IRS investigation of the matter prompted the Schmidt Defendants to file their state-court lawsuit, against Wachovia, KPMG, and

---

[3]Although the copy of the Note filed in the Joint Appendix is dated October 13, 1998, it appears that the loan was actually made, and the Note executed, on September 21, 1998. A security agreement was executed in connection with the loan on September 21, 1998, and it references the Note as being executed on that date. Moreover, a portion of the loan proceeds were used to purchase a warrant from Sandpiper on September 24, 1998.

[4]Wachovia does not assert that the Schmidt Defendants' state-court claims relate to any loan document other than the Note.

Quadra, on June 2, 2003, seeking restitution and damages. As relevant here, the Schmidt Defendants' state-court complaint alleged the following claims against Wachovia: civil conspiracy, fraud, constructive fraud, negligent misrepresentation, promissory estoppel, unfair trade practices, and breach of fiduciary duties. Each of the claims in the state-court complaint derived from the same primary allegation: that Wachovia, in conjunction with KPMG and Quadra, wrongfully induced Schmidt to participate in the UBS FLIP.

On June 18, 2003, Wachovia filed its petition for an order compelling arbitration in the district court, invoking the court's diversity jurisdiction under 28 U.S.C. § 1332. By its petition, Wachovia asserted, pursuant to the Federal Arbitration Act (FAA), that the Schmidt Defendants were required to arbitrate their state-court claims under the arbitration clauses found in both the Note and the Warrant. By its Order of August 1, 2003, the district court declined to compel arbitration, concluding that the Schmidt Defendants' state-court claims bore no significant relationship to the Note, and that Wachovia, as a nonsignatory to the Warrant, had failed to establish that it was entitled to enforce the arbitration clause in the Warrant. *See* Order at 7-9.

Wachovia promptly appealed the Order to this Court and, by opinion of November 1, 2004, a divided panel remanded the matter to the district court with instructions to dismiss Wachovia's petition for lack of subject matter jurisdiction. *See Wachovia Bank, N.A. v. Schmidt*, 388 F.3d 414, 432 (4th Cir. 2004). Wachovia thereafter successfully petitioned the Supreme Court for certiorari, and the Court reversed our jurisdictional ruling and remanded the matter to us for further proceedings. *Wachovia Bank, N.A. v. Schmidt*, 126 S. Ct. 941, 952 (2006). We are thus now obliged to assess the merits of Wachovia's contentions that the Schmidt Defendants are required to arbitrate their state-court claims against Wachovia.

## II.

Because a district court's determination concerning the arbitrability of a dispute is ordinarily a matter of contract interpretation, we generally review such determinations de novo. *See Cara's Notions, Inc. v. Hallmark Cards, Inc.*, 140 F.3d 566, 569 (4th Cir. 1998). Where a

district court's ruling rests on an application of the doctrine of equitable estoppel, however, we review for an abuse of discretion only. *See Brantley v. Republic Mortgage Ins. Co.*, 424 F.3d 392, 395 (4th Cir. 2005).

### III.

The Supreme Court has long recognized that the purpose of the FAA was "'to reverse the longstanding judicial hostility to arbitration agreements . . . and to place arbitration agreements upon the same footing as other contracts.'" *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 289 (2002) (quoting *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 24 (1991)). Thus, our task in assessing the arbitrability of a dispute "primarily is one of contract interpretation," *Summer Rain v. Donning Co.*, 964 F.2d 1455, 1460 (4th Cir. 1992), and we are obliged to give effect to the intentions of the parties as expressed in their agreement, *see Cara's Notions, Inc. v. Hallmark Cards, Inc.*, 140 F.3d 566, 569 (4th Cir. 1998) (observing that "a court may not require a party to submit to arbitration any dispute which he has not agreed so to submit" (internal quotation marks omitted)). Any ambiguities regarding the scope of an arbitration clause, however, are to be resolved in favor of arbitration. *See Volt Info. Sci., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 475-76 (1989). Against the backdrop of these controlling principles, we assess in turn Wachovia's contentions that the arbitration clauses contained in the Note and the Warrant oblige the Schmidt Defendants to arbitrate their state-court claims.

### A.

As explained above, the Note's arbitration clause permits either party to compel arbitration of "any claim or controversy arising out of, or relating to" the Note. We have consistently held that an arbitration clause encompassing all disputes "arising out of or relating to" a contract embraces "every dispute between the parties having a significant relationship to the contract regardless of the label attached to a dispute." *Am. Recovery Corp. v. Computerized Thermal Imaging, Inc.*, 96 F.3d 88, 93 (4th Cir. 1996) (quoting *J.J. Ryan & Sons v. Rhone Poulenc Textile, S.A.*, 863 F.2d 315, 321 (4th Cir. 1988)); *see also Long v. Silver*, 248 F.3d 309, 316-17 (4th Cir. 2001) (ruling that,

where agreement required arbitration of any dispute "arising out of or relating to" agreement, the "governing standard" is whether claims have "significant relationship" thereto). Thus, the initial question we face in this appeal is whether the Schmidt Defendants' state-court claims are significantly related to the Note.[5]

As described above, Wachovia and Schmidt had two distinct relationships. On the one hand, as memorialized by the Financial Advisory Services Contract, Wachovia served Schmidt as a financial advisor in connection with the UBS FLIP. For these services Schmidt paid Wachovia the sum of $100,000. On the other hand, as evidenced by the Note, Wachovia served as a lender to Schmidt. Although the funds loaned to Schmidt by Wachovia were invested in the UBS FLIP, Wachovia's two roles as lender and adviser were distinct.

Importantly, the Schmidt Defendants' state-court claims against Wachovia derive exclusively from the adviser-advisee relationship between Wachovia and Schmidt. Although the state-court claims asserted by the Schmidt Defendants vary, they share a single factual premise: that Wachovia wrongfully induced Schmidt to participate in the UBS FLIP. At the latest, Schmidt's decision to participate in the UBS FLIP was formalized by September 10, 1998, the date on which Schmidt entered into the Financial Advisory Services Contract and agreed to pay Wachovia $100,000 for its advisory services in connection with the UBS FLIP. The alleged wrongful inducement, therefore,

---

[5]We recognize that requiring a *significant* relationship in order to compel arbitration of the Schmidt Defendants' state-court claims appears to be at odds with the language of the Note's arbitration clause, which only requires that the Schmidt Defendants' claims "*relate to*" the Loan Documents. We recognize as well that to require such a significant relationship may appear to be in tension with the Supreme Court's mandate that we apply the ordinary tools of contract interpretation in construing an arbitration agreement, and resolve any ambiguities in favor of arbitration. *See Volt*, 489 U.S. at 475-76. We, however, are constrained to adhere to our precedent in *Long* and *American Recovery*. And in those decisions we construed arbitration agreements that are materially indistinguishable from the one found in the Note to require, before referring a matter to arbitration, the existence of a significant relationship between the claims asserted and the contract containing the arbitration clause. *See Long*, 248 F.3d at 316-17; *Am. Recovery*, 96 F.3d at 93.

had occurred by September 10, 1998, eleven days before the Note was executed on September 21, 1998. Moreover, a court's resolution of the Schmidt Defendants' state-court claims will require no inquiry into the Note's terms, nor even knowledge of the Note's existence. Indeed, Schmidt satisfied the Note in full in 1999, more than three years before the Schmidt Defendants filed suit against Wachovia in the South Carolina state court.

Nevertheless, Wachovia asserts that the Schmidt Defendants' state-court claims are significantly related to the Note because the UBS FLIP and the loan evidenced by the Note were part of a "single, integrated course of dealing" between the parties. Appellant's Br. at 14. In so asserting, Wachovia ignores the fact that the core of the Schmidt Defendants' claims is not the UBS FLIP itself, but Wachovia's role in inducing Schmidt to participate therein. And according to the Schmidt Defendants' state-court complaint, that inducement consisted of representations concerning the probable success and legitimacy of the UBS FLIP, not any promise by Wachovia to loan Schmidt the funds necessary for his participation in the UBS FLIP. Furthermore, although the loan evidenced by the Note enabled the Schmidt Defendants to participate in the UBS FLIP, we would be speculating to assert that the loan was a necessary condition of Schmidt's participation in the UBS FLIP; that is, we are unable to say that Schmidt would have abstained from participating in the UBS FLIP without the loan from Wachovia.

In support of its position, Wachovia relies primarily on three decisions of this Court: *J.J. Ryan & Sons, Inc. v. Rhone Poulenc Textile, S.A.*, 863 F.2d 315 (4th Cir. 1988), *Cara's Notions, Inc. v. Hallmark Cards, Inc.*, 140 F.3d 566 (4th Cir. 1998), and *Long v. Silver*, 248 F.3d 309 (4th Cir. 2001). None of those precedents, however, applies here. Although in both *Long* and *J.J. Ryan*, we interpreted arbitration clauses materially identical to the one in the Note to encompass claims that did not arise directly from the agreement containing the clauses, each of those decisions involved claims that derived from the specific relationship created by the relevant agreement. *See Long*, 248 F.3d at 317-19 (concluding that arbitration clause in shareholder and employment agreement encompassed tort and contract claims that arose from shareholder and employment relationships created by agreement); *J.J. Ryan*, 863 F.2d at 318-19 (ruling that arbitration

clause in exclusive distribution contract encompassed claims involving enforcement of ancillary agreements that were necessary to implement distribution contract). Our decision in *Cara's Notions*, on the other hand, involved an arbitration clause far broader than the one in the Note — one that embraced all claims "arising out of or relating to . . . *any aspects of the relationship between*" the parties (including those aspects not created or governed by the agreement containing the arbitration clause) — and thus bears no relevance to this case. *See Cara's Notions*, 140 F.3d at 568.

In sum, the Schmidt Defendants' state-court claims derive solely from actions Wachovia took as a financial advisor to induce Schmidt to participate in the UBS FLIP. Moreover, the events giving rise to these claims occurred before the Note was even executed. In these circumstances, the Schmidt Defendants' state-court claims are not significantly related to the Note.

## B.

Wachovia, as an additional basis for compelling the Schmidt Defendants to arbitrate, also contends that the Warrant's arbitration clause requires the arbitration of the Schmidt Defendants' state-court claims. Although not a signatory to the Warrant, Wachovia maintains that the Schmidt Defendants are equitably estopped from denying the applicability of the Warrant's arbitration clause to their state-court claims against Wachovia. The Schmidt Defendants respond that the principles of equitable estoppel have no application in this case. They alternatively contend that their claims are not significantly related to the Warrant.

"Equitable estoppel precludes a party from asserting rights he otherwise would have had against another when his own conduct renders assertion of those rights contrary to equity." *Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH*, 206 F.3d 411, 417-18 (4th Cir. 2000) (internal quotation marks omitted). We have recognized that where a signatory relies on the terms of, and seeks benefits from, a contract in a suit against a nonsignatory, the signatory is estopped from asserting that the nonsignatory is precluded from enforcing the contract's arbitration clause. *Long*, 248 F.3d at 320-21; *see also Brantley v. Republic Mortgage Ins. Co.*, 424 F.3d 392, 395-96 (4th

Cir. 2005) (observing that a signatory can be estopped from repudiating arbitration clause where its claims are "intertwined" with terms of contract containing arbitration clause). This legal principle rests on a simple proposition: it is unfair for a party to "rely on [a] contract when it works to its advantage, and repudiate it when it works to its disadvantage." *Hughes Masonry Co. v. Greater Clark County Sch. Bldg. Corp.*, 659 F.2d 836, 839 (7th Cir. 1981) (internal quotation marks and alteration omitted). Thus, in *Long*, where the plaintiff sought, through his lawsuit, to claim the benefit of his status as a shareholder — status which derived from a shareholder agreement to which he was a signatory — he was estopped from asserting that the nonsignatory defendant possessed no right to enforce the agreement's arbitration clause. *See* 248 F.3d at 320-21 (observing that "[a]llowing Long to avoid the consequences of the [shareholder agreement] while invoking its benefits . . . would both disregard equity and contravene the FAA" (internal quotation marks and alterations omitted)); *see also Sunkist Soft Drinks, Inc. v. Sunkist Growers, Inc.*, 10 F.3d 753, 757 (11th Cir. 1993) (ruling that party is estopped from denying application of agreement's arbitration clause where party "rel[ies] on the terms of the . . . agreement in asserting [its] claims"); *Hughes Masonry*, 659 F.2d at 840-41 (concluding that where signatory attempts to hold nonsignatory to terms of contract, nonsignatory is estopped from repudiating arbitration clause in contract).

According to Wachovia, the Schmidt Defendants are estopped from repudiating the Warrant's arbitration clause because they have made the Warrant a "central feature of their allegations." Reply Br. at 13. As an initial matter, it is far from clear whether a close factual connection between claims and a contract is sufficient in itself to estop a signatory from denying the applicability of the contract's arbitration clause. In any event, no such close connection exists here. To be sure, the Warrant forms part of the factual foundation underlying the Schmidt Defendants' state-court claims. Their central assertion is that Wachovia and others wrongfully induced Schmidt to participate in the UBS FLIP, and the Warrant comprised part of the UBS FLIP. The terms of the Warrant, however, are only tangentially related to the heart of the Schmidt Defendants' state-court claims. They are relevant only insofar as they help to demonstrate that the UBS FLIP as a whole was an illegitimate basis-shifting tax shelter that the IRS has opposed. The meat of the Schmidt Defendants' claims, on the other

hand, is that Wachovia and others knew or should have known, at the time the UBS FLIP was implemented, that the IRS would take the position that the UBS FLIP was an illegal tax shelter. And the terms of the Warrant are largely irrelevant to proof of that fact.

Wachovia also asserts, in a manner more consistent with our precedent, that the Schmidt Defendants are attempting in their state-court lawsuit to obtain a benefit under the Warrant by seeking to recover the cost of the Warrant. The Schmidt Defendants' state-court complaint, however, does not specifically seek recovery of the Warrant's cost; rather, it prays generally for restitution and damages. The restitution sought from Wachovia is presumably the $100,000 paid to Wachovia under the Financial Advisory Services Contract. And while any damages awarded to the Schmidt Defendants may include the cost of the Warrant if such cost is an element of their loss, the Schmidt Defendants are not invoking the terms of the Warrant against Wachovia in such a way as to render it inequitable to deny Wachovia the benefit of the Warrant's arbitration clause. Moreover, the Schmidt Defendants do not invoke any rights under the terms of the Warrant, nor do they seek to impose any of the Warrant's obligations on Wachovia. Indeed, they assert that the Warrant was "properly constructed, executed and surrendered" in 1998, more than four years before they initiated their state-court suit against Wachovia. Appellee's Br. at 26.

Finally, Wachovia maintains that the Schmidt Defendants should be estopped from denying the applicability of the Warrant's arbitration clause because they received valuable benefits from the Warrant, including the ability to claim large capital losses on their federal tax returns and to invoke certain favorable provisions of the Internal Revenue Code. *See* Appellant's Br. at 23-24. As an initial matter, it is not clear that the Schmidt Defendants received the tax benefits referred to by Wachovia. In support of its claim that such benefits were received, Wachovia relies on a law firm's opinion letter that the Schmidt Defendants assert to be fraudulent. And, according to the Schmidt Defendants' allegations, the IRS has taken the position that any tax "benefits" they received were illegitimate. In any event, the decision on which Wachovia primarily relies for this point — *Am. Bureau of Shipping v. Tencara Shipyard S.P.A.*, 170 F.3d 349 (2d Cir. 1999) — is inapposite because that decision involved the reverse situ-

ation from that presented here: a *signatory* to a contract seeking to estop a *nonsignatory* from repudiating the contract's arbitration clause. *See* 170 F.3d at 353 (estopping nonsignatory where nonsignatory received "direct benefits" from contract); *see also Thomson-CSF, S.A. v. Am. Arbitration Ass'n*, 64 F.3d 773, 778 (2d Cir. 1995) (observing that nonsignatory is estopped where it "knowingly exploit[s]" contract). In *Tencara*, the contract at issue imposed no legal obligations on the nonsignatory, yet the nonsignatory enjoyed substantial benefits from the contract. In such circumstances, it was deemed inequitable for the nonsignatory to receive the contract's benefits without shouldering the burden of the contract's arbitration clause. *See* 170 F.3d at 353. Where a *signatory* is sought to be estopped, however, the equities are much different, for a signatory is necessarily bound by the terms of a valid contract for which he has bargained. In other words, a contract signatory does not enjoy the pure windfall experienced by a nonsignatory who receives only a contract's benefits.

The fact that a signatory receives benefits from a contract is therefore insufficient, in and of itself, to estop it from asserting that a nonsignatory is not entitled to invoke the contract's arbitration clause. And Wachovia has failed to establish any other inequitable conduct on the Schmidt Defendants' part that justifies an estoppel. The district court, by its Order, thus properly exercised its discretion in denying Wachovia's claim to compel arbitration under the principles of equitable estoppel.[6]

## IV.

Pursuant to the foregoing, the judgment of the district court is affirmed.

*AFFIRMED*

---

[6]Because Wachovia is not entitled to the benefit of an equitable estoppel, we need not reach the Schmidt Defendant's alternative contention that their state-court claims are not significantly related to the Warrant.