43 A.3d 1081

Helen C. GRIGGS, et al.

v.

Luke EVANS, et al.

No. 2596, Sept. Term, 2009.

Court of Special Appeals of Maryland.

May 2, 2012.

66

William M. Burke, Manchester, MD, for appellant.

Neal R. Troum (Andrew K. Stutzman, Philadelphia, PA, and Rachel Tausend, Washington, DC, Stradley Ronon Stevens & Young, LLP, on the brief), for appellee.

Panel: KRAUSER, C.J., EYLER, JAMES R. and WATTS, JJ.

KRAUSER, C.J.

■ Helen C. Griggs and her late husband, Victor G. Griggs, refinanced the mortgage on their home with Beneficial Mortgage Company of Maryland. One of the mortgage instruments the Griggses executed, when they met with representatives of Beneficial Mortgage to obtain the refinancing, contained an arbitration rider, providing that disputes "arising from or relating" to their agreement with Beneficial Mortgage, "shall be resolved, upon the election of [either party] by binding arbitration." At that time, they also signed an application for a credit life insurance policy[1] from Household Life Insurance Company, appellee, covering them both.

Two years after the refinancing, Mr. Griggs died, whereupon Mrs. Griggs requested payment under that policy. When Household Life denied that request, claiming that the policy papers the Griggses had signed contained inaccurate information regarding Mr. Griggs's health history, Mrs. Griggs, on behalf of herself and her late husband's estate, brought an action, in the Circuit Court for Baltimore City, against Household Life, alleging breach of contract and intentional infliction of emotional distress.

After considerable discovery, Mrs. Griggs filed successive amended complaints, adding a claim of insurance fraud and, as defendants, the individuals who had participated in the meeting, at which she and her late husband had executed both the refinancing documents and the credit life insurance application, namely: Integrated Real Estate Processing LP ("Inte-

---

1. Credit life insurance is a life insurance contract, commonly issued with a major purchase such as a mortgage, providing for payment to the creditor in the event the borrower dies.

grated Real Estate"), which was engaged in the business of closing mortgage loans for financing companies, such as Beneficial Mortgage; Luke Evans, Beneficial Mortgage's office manager; Marc Kurlander, an independent loan closer who worked, under contract, for Integrated Real Estate; and Andreas Teddy Dailey, Jr., an account executive for Beneficial Mortgage; whom, together with Household Life, we shall collectively refer to as "appellees." All three individual appellees—Kurlander, Evans, and Dailey—participated both in closing the Griggses' loan and in procuring the Griggses' application for credit life insurance.

After Evans and Dailey were added to the suit, they, together with Household, filed a motion to dismiss. In that motion, Evans and Dailey—but not Household Life—demanded arbitration, citing the arbitration rider the Griggses had executed as part of their mortgage lending agreement with Beneficial. That demand was coupled with a request that all other proceedings be stayed pending the outcome of arbitration. When the Baltimore City court granted the request of Evans and Dailey for arbitration "on all issues" and stayed all proceedings until arbitration was concluded, Mrs. Griggs noted this appeal.

Because we conclude that the circuit court erred in granting the request for arbitration, we shall vacate that court's order compelling arbitration and remand for further proceedings.

## FACTS

Mr. and Mrs. Griggs owned a home in Randallstown, Maryland, which was financed by notes secured by two deeds of trust. In early January 2006, they received an unsolicited telephone call from appellee Andreas Teddy Dailey, Jr., an account executive for Beneficial Mortgage, offering to refinance their mortgage. The Griggses accepted that offer. After the Griggses' home was appraised, appellee Dailey told them that their loan had been approved and that he had arranged an appointment at Beneficial's office in Owings Mills to complete their refinancing. It was, at that time, he claims,

that he suggested to the Griggses that they purchase a credit life insurance policy.

As agreed, on January 20, 2006, the Griggses went to Beneficial's office to execute the loan documents. Present for that occasion were, in addition to the Griggses, appellees Evans, Dailey, and Kurlander. At Beneficial's office, the Griggses were, in the words of the complaint Mrs. Griggs filed, "presented with a voluminous amount of paperwork to sign and initial." They did so as to a host of documents, including a note, deed of trust, and arbitration rider (all of which we shall collectively refer to as the "Mortgage Agreement"), as well as an application for credit life insurance. Mrs. Griggs claims that neither she nor her husband were aware that the life insurance application was among the documents they were executing.

Appellee Luke Evans, Beneficial's office manager, purportedly reviewed the documents after the Griggses had signed and initialed them. When Evans completed that task, the Griggses were handed a package which, according to the complaint, contained copies of all of the documents they had just executed. Mrs. Griggs maintains, however, that the package did not contain a copy of the application for credit life insurance.

Appellee Marc Kurlander, an independent loan closer working, under contract, for Integrated Real Estate, actually filled out the insurance application. In doing so, he asked the Griggses, he claims, each question and recorded their answers on the application.

Among the questions set forth in the application was a series of queries regarding the Griggses' respective medical histories. Of particular relevance here was this query:

Have you been diagnosed by a member of the medical profession as having (1) high blood pressure, (2) cancer or tumor, (3) AIDS (Acquired Immune Deficiency Syndrome) or an ARC (AIDS Related Complex), (4) heart disease, (5) stroke, (6) diabetes, (7) drug or alcohol related condition; any disease or disorder of the (8) digestive system, (9)

lungs, (10) kidneys, (11) liver, or (12) blood (other than AIDS)?

Directly across the page from this query were two checkboxes, one labeled "1st Applicant" and the other "2nd Applicant." Each box was checked "No." But, according to Mrs. Griggs, neither she nor her husband was ever asked any questions about their medical histories during the refinancing process.

Shortly after the completion of the refinancing, the Griggses became aware of the existence of the insurance policy, as the first loan statement they received included a monthly insurance premium of $162.50. When the Griggses telephoned the office of Beneficial Mortgage to inquire about the charge, they were informed that it was a monthly premium for credit life insurance. The Griggses paid the premium and did so each month thereafter.

On January 12, 2008, Victor Griggs died of lung cancer. After her husband's death, Helen Griggs filed an insurance claim with Household Life, demanding payment of $150,000, the maximum benefit under the policy. In March 2008, a representative of Household called Mrs. Griggs, asking about Victor's health prior to his terminal illness. Mrs. Griggs disclosed that Victor had suffered from diabetes and hypertension.

In a letter dated April 14, 2008, Household Life denied Mrs. Griggs's insurance claim on the ground that Victor Griggs had failed to disclose material facts about his medical history that, if they had been disclosed, would have resulted in a denial of coverage for him. The letter therefore rescinded coverage of Mr. Griggs, "declar[ing] it void from its inception in accordance with the insurance certificate." The letter concluded with the statement that Mrs. Griggs would "receive a premium refund check" and that the Griggses' joint life insurance was "no longer in force on this account," but that single life insurance would "remain in force for Helen Griggs." Attached to the letter was a copy of the Griggses' insurance

application, including the page containing the medical history questions.

Mrs. Griggs claims that neither she nor her late husband filled out the insurance application, that neither of them "were asked any questions regarding their health," and that, although the application "appears to contain her signature and that of Victor Griggs[,] . . . she can only guess that [the insurance application] must have been slipped into the voluminous numbers of papers they signed."

On September 18, 2008, Mrs. Griggs filed a complaint against Household Life in the Baltimore City circuit court, alleging breach of contract and intentional infliction of emotional distress. On October 15, 2008, Mrs. Griggs filed an amended complaint, joining Evans as a defendant, and adding an additional count alleging civil conspiracy: specifically, that appellees Household Life and Evans conspired to fill out a fraudulent credit life insurance application, with the understanding that, if a claim were ever subsequently made, it would be denied.

On January 5, 2009, Household Life and Evans filed a motion to dismiss for failure to state a claim upon which relief could be granted. After a hearing, the court dismissed the breach of contract claim against Evans and the civil conspiracy claim against both him and Household, without prejudice. Household and Evans thereafter filed answers to the remaining counts of the first amended complaint.

On April 10, 2009, appellee Household Life propounded its first set of interrogatories and request for production of documents. One week later, the circuit court issued a scheduling order. On May 6, 2009, Household Life and Evans filed a motion for protective order with respect to Mrs. Griggs's notice of deposition *duces tecum*. On May 29, 2009, the parties filed a consent motion to amend the scheduling order to extend various deadlines for scheduling depositions and designating expert witnesses.

On July 17, 2009, with the benefit of discovery, Mrs. Griggs filed a second amended complaint. That complaint joined

three new defendants: appellees Integrated Real Estate, Kurlander, and Dailey; and re-alleged breach of contract by Household Life, intentional infliction of emotional distress by Household, Evans, Kurlander, and Dailey, and civil conspiracy involving Household and Evans. In addition, it asserted three new counts. One of the new counts alleged insurance fraud by all of the appellees; the remaining two new counts claimed that Household Life and Integrated Real Estate were vicariously liable for the acts of their respective agents.

Common to all counts in the second amended complaint was the assertion that the individual appellees—Evans, Dailey, and Kurlander—as actual or apparent agents of Household Life and Integrated Real Estate and acting for their own pecuniary gain, fraudulently completed and then submitted the credit life insurance application in the Griggses' names. Their purpose, according to the Griggses, was to wrongfully extract premiums from them and to use the fraudulently obtained application to deny any claim that might subsequently be made by either her or her husband, after the other's death.

From July to late September 2009, the parties conducted substantial discovery, holding depositions, issuing subpoenas *duces tecum,* and filing designations of expert witnesses and corporate representatives to be deposed. On August 28, 2009, appellees Household Life, Evans, and Dailey filed a motion to dismiss. In that motion, Evans and Dailey moved, in the event that dismissal was not granted, to compel arbitration and, if compelled, to stay all proceedings pending the outcome of arbitration.

After a hearing on the motion to compel, the court issued a one-page order, granting the motion, ordering the Griggses "to submit to arbitration on all issues," and staying the proceeding pending the outcome of arbitration. Mrs. Griggs then, individually and on behalf of her husband's estate, noted this appeal.

## DISCUSSION

Although this case falls within the Federal Arbitration

Act ("FAA"),[2] as the arbitration rider is part of a contract involving interstate commerce and it expressly states that it is governed by the FAA, we nonetheless turn to state law in determining whether appellees can enforce that arbitration rider, *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 129 S.Ct. 1896, 1904, 173 L.Ed.2d 832 (2009); *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995); *accord Cheek v. United Healthcare of the Mid–Atlantic, Inc.*, 378 Md. 139, 147, 835 A.2d 656 (2003), because state law "is applicable to determine which contracts are binding under § 2 [of the FAA] and enforceable under § 3 [of the FAA] 'if that law arose to govern issues concerning the validity, revocability, and enforceability of contracts generally.' " *Carlisle*, 129 S.Ct. at 1902 (quoting *Perry v. Thomas*, 482 U.S. 483, 493 n. 9, 107 S.Ct. 2520, 96 L.Ed.2d 426 (1987)).

In so doing, we note, at the outset, that Maryland follows the objective standard of contract interpretation, which requires that "where the language employed in a contract is unambiguous, a court shall give effect to its plain meaning and there is no need for further construction by the court." *Wells v. Chevy Chase Bank, F.S.B.*, 363 Md. 232, 251, 768 A.2d 620 (2001). We apply that standard here, even though it evolved from cases in which the contest was between signatories to the contract and not, as here, where none of the parties, except the Griggses, are signatories to the arbitration rider, as that provision is in the Mortgage Agreement, not the credit life insurance policy.

### Integration Clause

The credit life insurance policy, prepared by Household Life, not only does not include an arbitration clause but contains an integration provision, designated the "Entire Contract" provision. That provision states that "[t]he Group Policy, the attached application for it, and application for insurance, if any, are the entire contract of insurance." By

---

2. 9 U.S.C. §§ 1–16.

this provision, Household Life disclaimed any suggestion that the provision or clause of any other contract, which would include the Mortgage Agreement and its arbitration rider, was incorporated by reference into the credit life insurance contract.

■■■■ Having rejected, by implication, the arbitration rider, it may not now, on appeal,[3] claim its benefits. More broadly stated, just as "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit," *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960), so, it may not invoke an arbitration agreement it has refused to be bound by, when such an invocation suits its purposes.

### "Significant Relationship Test"

The arbitration rider at issue provides that either the "Lender," that is, Beneficial Mortgage, or the Griggses "may request that any claim, dispute, or controversy . . . arising from or relating to" the Mortgage Agreement "or the relationships which result from" that agreement, "including the validity or enforceability of [the] arbitration clause, any part thereof or the entire [a]greement, shall be resolved, upon the election of" either party, by binding arbitration. It is undisputed that this is a "broadly worded" arbitration clause. *See Am. Recovery Corp. v. Computerized Thermal Imaging, Inc.*, 96 F.3d 88, 92–93 (4th Cir.1996) (arbitration clause covering any dispute "arising out of or related to this . . . Agreement" held "broadly worded"). What is disputed are the consequences that flow from that fact.

■■■■ That is because a "broadly worded" arbitration clause triggers the "significant relationship test," by application of which we determine whether an arbitration contractual provi-

---

3. Although Household Life did not formally request by motion below, arbitration, it has joined the other appellees in maintaining that the circuit court did not err in compelling arbitration.

sion applies to a dispute that does not arise from the governing contract (such as the Griggses' Mortgage Agreement), but under a related agreement (such as the Griggses' credit life insurance policy). According to that test, "when a 'significant relationship' exists between the asserted claims and the contract in which the arbitration clause is contained," those claims must be submitted to arbitration. *Long v. Silver,* 248 F.3d 309, 316 (4th Cir.2001), *overruled on other grounds, Hertz Corp. v. Friend,* 559 U.S. ——, ——, 130 S.Ct. 1181, 1190–92, 175 L.Ed.2d 1029 (2010).

Appellees contend that "this dispute unquestionably has a significant relationship with the mortgage document containing the arbitration rider." They reason that, because Mrs. Griggs's claims, under the life insurance policy, "arise from and relate to the execution of the mortgage and life insurance documents, and the execution of those documents only" and because "a life insurance policy like the one at issue here is not even available standing alone, but can only be obtained as part of a mortgage transaction," the significant relationship test is satisfied, and thus, the arbitration rider applies to this dispute. (Emphasis deleted.)

Appellees maintain that *American Recovery, supra,* 96 F.3d 88, provides ample support for their contention that the "significant relationship" between the Griggses' claims and the Mortgage Agreement, containing the arbitration rider, enables them to invoke arbitration as to the Griggses' claims, based on the credit life insurance policy. It does not.

In that case, after entering into a joint venture to install thermal imaging equipment in hospitals in China, Computerized Thermal Imaging, Inc. ("CTI"), contracted with American Recovery Corporation ("ARC"), a consulting firm, "to provide assistance in seeking the services of a professional communications engineering firm for the project." *Id.* at 90. The consulting agreement contained an arbitration clause providing that "any dispute, controversy, or claim arising out of or related to this [c]onsulting [a]greement shall be resolved by binding arbitration." *Id.* "In addition to the consulting agree-

ment with CTI, ARC entered into noncircumvention agreements with two engineering firms, Fluor–Daniel and Parsons Engineering, which prevented those ... firms from negotiating with the consortium [to which CTI belonged] except through ARC." *Id.* At CTI's direction, ARC successfully negotiated with a third party, Electronic Data Systems ("EDS"), to provide capital and technical expertise to CTI as part of the joint venture. *Id.*

After ARC had purportedly performed under the consulting agreement but was not paid, Richard V. Secord, Director and President of ARC, resigned and was hired by CTI. Mr. Secord then assisted CTI in securing the services of Fluor–Daniel to work on the China project.

Following CTI's failure to pay ARC for its services and Mr. Secord's departure from ARC to CTI, ARC filed suit, in federal district court, against CTI, Mr. Secord, and others,[4] alleging, among other things, that CTI induced Mr. Secord's alleged breach of his fiduciary duty to ARC, that CTI persuaded Fluor–Daniel to breach its noncircumvention agreement, and that ARC was entitled to be paid by CTI for its role in securing financing. *Id.* at 90–91. In response, CTI moved for arbitration, citing the arbitration clause in its consulting agreement with ARC. *Id.* at 91. The district court, relying on *Mediterranean Enters. v. Ssangyong Corp.*, 708 F.2d 1458 (9th Cir.1983), denied CTI's motion, reasoning that ARC's "claims against CTI neither arose out of nor related to the consulting agreement that contained the arbitration clause upon which CTI based its motion." *American Recovery*, 96 F.3d at 90.

The Fourth Circuit vacated the district court's order denying arbitration, asserting that the district court had "used the improper legal standard for determining whether ARC's claims were arbitrable." *Id.* The federal appellate court ex-

---

**4.** The other defendants in *American Recovery* were a law firm that formerly had represented ARC and a partner in that firm, who had negotiated Mr. Secord's personal services agreement with CTI. *Id.* at 91.

plained that, unlike the narrowly worded arbitration clause in *Mediterranean Enterprises,* which covered only "disputes arising" under the consulting agreement, 708 F.2d at 1461, the broadly worded arbitration clause in *American Recovery* covered any claim "arising out of or related to" the contract. 96 F.3d at 93. In short, it was a "broadly worded" arbitration clause, and thus, the correct standard was the "significant relationship test." ARC's claims, it then concluded, were significantly related to the consulting agreement and hence were arbitrable. *Id.* at 93–95.

In reaching that result, the Fourth Circuit observed that "the factual allegations underlying" ARC's first claim, that CTI tortiously induced Mr. Secord to breach a fiduciary duty owed to it, fell "within the scope of the consulting agreement's arbitration clause," reasoning that that claim was tantamount to a "conten[tion] that CTI, through the personal services agreement [between CTI and Secord], induced Secord to misappropriate a corporate opportunity that rightly belonged to ARC." *Id.* at 93–94. To prevail on that claim, ARC, it pointed out, was required to show that it had a "legitimate interest" in a particular business opportunity. *Id.* (citation and quotation omitted). But, to establish that it had such a legitimate interest, ARC relied on the terms of its consulting agreement with CTI. *Id.* at 94. Thus, proof of ARC's claim that CTI induced Secord to breach his fiduciary duty was "rooted in the existence and terms of the consulting agreement," or, in other words, that claim was significantly related to the consulting agreement, with its broadly worded arbitration clause. *Id.*

Furthermore, ARC's claim that CTI tortiously induced Fluor–Daniel's breach of its noncircumvention agreement was, the Fourth Circuit found, significantly related to the consulting agreement, since an "express term of the consulting agreement mandate[d] that CTI ... not enter into any agreement with Fluor–Daniel in violation of the non[-]circumvention agreement." *Id.* And, finally, ARC's quantum meruit claim was, also, significantly related to the consulting agreement, declared the Fourth Circuit, as ARC "again clearly relie[d] on

the terms of the consulting agreement to prove its claim." *Id.* at 95. Specifically, ARC's quantum meruit claim depended on "a prior amendment to the consulting agreement" as well as its allegation that Mr. Secord had assured it of compensation for its efforts to secure funding from EDS "through the vehicle of an amendment to the consulting agreement." *Id.*

The facts of *American Recovery* differ materially from those of the instant case. In contrast to *American Recovery*, where arbitration was successfully invoked by a signatory to the contract containing the arbitration clause, none of the appellees currently before us is a party to the Mortgage Agreement containing the arbitration rider.

■ Moreover, in *American Recovery*, the plaintiff's claims were significantly related to the consulting agreement with its broadly worded arbitration clause. As previously noted, ARC relied upon the terms of the consulting agreement to prove its claims. Here, in contrast, the Griggses' claims do not rely at all on the terms of the Mortgage Agreement, the contract which includes the broadly worded arbitration rider. Rather, their claims—breach of the insurance policy and insurance fraud—are based solely on the terms of the optional credit life insurance contract and the circumstances surrounding the formation of that contract. We therefore reject appellees' contention that, merely because "a life insurance policy like the one at issue here is not even available standing alone, *but can only be obtained as part of a mortgage transaction,*" the "significant relationship test" is satisfied. *American Recovery* is neither controlling nor even applicable here.

■ Furthermore, claims arising under a contract, which is transactionally related to another contract containing a broadly worded arbitration clause, are not necessarily "significantly related" to the contract containing that arbitration clause, and application of the "significant relationship test" does not always require arbitration of such claims. A Fourth Circuit decision rendered ten years after *American Recovery*, in *Wachovia Bank, N.A. v. Schmidt*, 445 F.3d 762 (4th Cir. 2006), illustrates precisely this point.

Schmidt, the owner of a successful business, wished to sell his business while minimizing taxes that would be due on the "very substantial capital gain" resulting from that sale. *Id.* at 765. To achieve this end, investment advisors from Wachovia recommended that he make highly leveraged investments in the stock of United Bank of Switzerland ("UBS"). That strategy would, according to the Wachovia advisors, enable Schmidt to enjoy a "basis shift," thereby shielding his capital gains from federal taxation. *Id.*

To implement this investment plan, Schmidt borrowed $3.5 million from Wachovia, executing a note and security agreement in favor of Wachovia. The note contained a broadly worded arbitration clause. Then, to accomplish the plan's objective, Schmidt used the proceeds from the loan to purchase a warrant in the stock of a Cayman Islands company, which held a leveraged position in UBS stock. The warrant also contained a broadly worded arbitration clause. *Id.* at 765–66 & n. 3. Thereafter, Schmidt paid off the note.

But, after Schmidt purchased the warrant and paid off the note, the Internal Revenue Service issued a public notice, advising that "basis shifting" tax shelters, such as that which Wachovia advisors had persuaded him to implement, "could be subject to disallowance for tax purposes, interest on unpaid taxes, and potentially penalties as well." *Schmidt,* 445 F.3d at 766. As a result, Schmidt ended up facing more than three million dollars in back taxes as well as additional interest and penalties. That unexpected result led Schmidt to file suit in state court against Wachovia, alleging civil conspiracy, fraud, constructive fraud, negligent misrepresentation, promissory estoppel, unfair trade practices, and breach of fiduciary duties. Wachovia responded by turning to federal district court and filing there a petition for an order compelling arbitration. When the federal district court denied the petition, Wachovia appealed that decision.

The Fourth Circuit affirmed, rejecting, among other things, Wachovia's contention that Schmidt's claims were "significantly related" to the note. After pointing out that "Wachovia and

Schmidt had two distinct relationships," that is, Wachovia served both as Schmidt's financial adviser and as his lender, the Fourth Circuit found that, because Schmidt's claims "derive[d] solely from actions Wachovia took as a financial advisor to induce Schmidt to participate in" the investment strategy, they were not "significantly related" to the note and its broadly worded arbitration clause. *Id.* at 768–69.

In the instant case, as in *Schmidt,* 445 F.3d at 768, appellees Evans, Dailey, Kurlander, and Integrated Real Estate "had two distinct relationships" with the Griggses: specifically, they served as agents of Beneficial Mortgage in closing the mortgage loan, and they acted as agents of Household Life in selling the optional credit life insurance policy to the Griggses. Appellee Household Life, itself, was not even involved in closing the Griggses' mortgage loan. In fact, Household Life's only relationship with the Griggses was in providing them with credit life insurance. Moreover, as in *Schmidt,* the Griggses' claims "derive solely from actions" taken by Evans, Dailey, Kurlander, and Integrated Real Estate, acting as Household's agents, to induce the Griggses to purchase credit life insurance and were not "significantly related" to the Mortgage Agreement and its broadly worded arbitration clause. *Id.* at 769.

Finally, if signatories to an agreement containing an arbitration provision cannot, as in *Schmidt,* enforce that provision because of the absence of a "significant relationship" between the claims and the contract containing the arbitration provision, then, *a fortiori,* non-signatories to such an agreement, as appellees were, cannot.

### Equitable Estoppel and Agency

Nor do we find appellees' invocation of equitable estoppel and agency, as alternative bases for granting their arbitration request, convincing. The doctrine of equitable estoppel[5] permits non-signatories to enforce an arbitration

---

5. In enforcing arbitration agreements, "equitable estoppel," though invoked by bench and bar, may be a bit of a misnomer. While

provision, first, when a signatory "must rely on the terms of the written agreement [containing the arbitration clause] in asserting [its] claims," *Sunkist Soft Drinks, Inc. v. Sunkist Growers, Inc.*, 10 F.3d 753, 757 (11th Cir.1993), and "seeks to claim the benefit of" such an agreement "while simultaneously attempting to avoid the terms of an arbitration provision contained therein," *Long, supra*, 248 F.3d at 320 (citation and quotation omitted); or, second, "when the signatory to the contract containing [an] arbitration clause raises allegations of substantially interdependent and concerted misconduct by both the non[-] signatory and one or more of the signatories to the contract," *Westmoreland v. Sadoux*, 299 F.3d 462, 467 (5th Cir.2002), or, more succinctly put, "when the issues the non[-]signatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed." *Thomson–CSF, S.A. v. Am. Arbitration Ass'n*, 64 F.3d 773, 779 (2d Cir.1995). The doctrine of equitable estoppel is rooted in the equitable principle that it would be unfair "for a party to 'rely on [a] contract when it works to its advantage, and repudiate it when it works to its disadvantage.' " *Schmidt*, 445 F.3d at 769 (quoting *Hughes Masonry Co. v. Greater Clark County Sch. Bldg. Corp.*, 659 F.2d 836, 839 (7th Cir. 1981)).

 In reviewing a trial court's application of equitable estoppel to an arbitration dispute, we apply this standard: "[I]f the determination on equitable estoppel is based on the resolution of disputed facts, the decision is reviewed for sub-

detrimental reliance is normally an element of equitable estoppel, most states that apply equitable estoppel, in the context of arbitration agreement enforcement, do so without requiring that the party invoking the doctrine prove detrimental reliance. *Schuele v. Case Handyman & Remodeling Servs., LLC*, 412 Md. 555, 563 n. 3, 989 A.2d 210 (2010) (observing "that in the arbitration context 'equitable estoppel' is a misnomer because, unlike equitable estoppel in a contracts context, detrimental reliance is not required"). *But see Dickerson v. Longoria*, 414 Md. 419, 453–54, 995 A.2d 721 (2010) (declining to compel estate of nursing home patient to arbitrate dispute with nursing home where there was no evidence that nursing home "changed its position for the worse based on [personal representative's] assertion").

stantial evidence, but if there is no dispute of facts, but only a dispute on the legal effect of those facts, de novo review is appropriate." *Case Handyman & Remodeling Services, LLC v. Schuele,* 183 Md.App. 44, 54, 959 A.2d 833 (2008) (*Case Handyman I* ), *vacated on other grounds,* 412 Md. 555, 989 A.2d 210 (2010) (*Case Handyman II* ). Since there is no dispute of facts before us, but "only a dispute [as to] the legal effect of those facts," we apply, in the analysis that follows, a de novo standard. *Accord Thompson v. Witherspoon,* 197 Md.App. 69, 79–80, 12 A.3d 685 (2011).

We turn now to four cases that frame the issue before us. Two of those cases—*Case Handyman I* and *MS Dealer Service Corp. v. Franklin,* 177 F.3d 942 (11th Cir.1999)—present circumstances where courts have required signatories to an arbitration agreement to arbitrate their disputes with non-signatories under the doctrine of equitable estoppel. And, as we shall explain, those cases present a factual profile that does not match that of the instant case. The other two cases—*Brantley v. Republic Mortgage Insurance Co.,* 424 F.3d 392 (4th Cir.2005), and *Schmidt* (which we discussed earlier but in a different context)—where courts have held that non-signatories could not compel arbitration under the doctrine of equitable estoppel, present, on the other hand, a factual profile that largely matches the contours of the case before us.

As noted above, the first instance in which non-signatories may enforce an arbitration clause is when a signatory "must rely on the terms of the written agreement [containing the arbitration clause] in asserting [its] claims," *Sunkist, supra,* 10 F.3d at 757, and "seeks to claim the benefit of" such an agreement "while simultaneously attempting to avoid the terms of an arbitration provision contained therein." *Long, supra,* 248 F.3d at 320 (citation and quotation omitted). Relying on that principle, we held, in *Case Handyman I,* that homeowners suing a construction company for failure to perform certain work for them were estopped from denying that their claims were arbitrable, despite the fact that the construction company was a non-signatory to the arbitration agree-

ment that had been entered into by the homeowners with a franchisee of the construction company. 183 Md.App. at 48–50, 959 A.2d 833. The homeowners' entire case, we noted, " 'hinge[d] on [their] asserted rights under the . . . contract,' " and, consequently, they were estopped, we concluded, from refusing to arbitrate their dispute with the construction company. *Id.* at 63, 959 A.2d 833 (quoting *Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH*, 206 F.3d 411, 418 (4th Cir.2000)).

The second instance in which a non-signatory may enforce an arbitration clause is "when the signatory to the contract containing [an] arbitration clause raises allegations of substantially interdependent and concerted misconduct by both the non[-]signatory and one or more of the signatories to the contract," *Westmoreland v. Sadoux*, 299 F.3d 462, 467 (5th Cir.2002). Illustrative of this application of equitable estoppel is *MS Dealer Service Corp. v. Franklin, supra,* 177 F.3d 942. Franklin bought a car from Jim Burke Motors. The car sales contract ("Buyers Order") incorporated by reference a "Retail Installment Contract," which obligated Franklin to purchase a service contract through MS Dealer for an additional $990.00. The Buyers Order contained a broadly worded arbitration clause, requiring the arbitration of "all disputes and controversies of every kind and nature between Buyer and Jim Burke Motors, Inc. arising out of or in connection with the purchase of this vehicle." *Id.* at 944.

When Franklin found that the car she had purchased had several defects, she filed suit in state court against Jim Burke Motors, MS Dealer, and Chrysler Credit Corporation, the assignee of the Retail Installment Contract, alleging breach of contract, breach of warranty, fraud, and conspiracy. In response, MS Dealer filed a petition in federal district court to compel arbitration of Franklin's claims. The district court denied the petition on the ground that MS Dealer was a non-signatory to the Buyers Order and, thus, lacked standing to compel arbitration. *Id.* at 945.

The Eleventh Circuit reversed, holding that "[b]oth of the circumstances giving rise to equitable estoppel exist[ed]" there. *Id.* at 947. But, for our purposes, we shall focus only on the second of those circumstances—the interdependence between Franklin's claims against the signatory, Jim Burke Motors, and the non-signatory, MS Dealer. The Eleventh Circuit found that all of Franklin's claims were based on the same facts and were inherently inseparable. As the federal appellate court observed, Franklin alleged that MS Dealer, Jim Burke Motors, and Chrysler Credit Corporation conspired to defraud her by charging her excessive amounts for the service contract, thereby "inducing her to incur needless debt and corresponding interest expenses in connection with her purchase of the car." *Id.* at 948. Although, of the three alleged conspirators, only Jim Burke Motors was a signatory, "Franklin's obligation to pay the $990.00 charge arose under the Buyers Order," the contract containing the arbitration clause, and Franklin "specifically allege[d] that MS Dealer worked hand-in-hand with Jim Burke and Chrysler Credit Corporation in this alleged fraudulent scheme." *Id.* Consequently, her " 'allegations of such pre-arranged, collusive behavior' " established, according to the federal appellate court, that her claims against MS Dealer were " 'intimately founded in and intertwined with the obligations imposed by the [Buyers Order]' " (quoting *Boyd v. Homes of Legend, Inc.*, 981 F.Supp. 1423, 1433 (M.D.Ala.1997)).

But, while *Case Handyman I* and *MS Dealer* present circumstances where non-signatories to an agreement containing an arbitration clause have successfully invoked to that clause under equitable estoppel, *Brantley v. Republic Mortgage Insurance Co., supra*, 424 F.3d 392, offer circumstances under which non-signatories' invocation of an arbitration clause has failed. The Brantleys bought a home with the help of a mortgage obtained from SouthStar Funding, L.L.C. As part of the mortgage lending transaction, the Brantleys also entered into a separate, broadly worded arbitration agreement with SouthStar Funding.

██ Because they financed the entire purchase price of the home, SouthStar Funding required them, as a condition of the loan, to purchase mortgage insurance.[6] The Brantleys purchased that insurance from Republic Mortgage Insurance Company ("Republic"). *Id.* at 394.

Republic Mortgage purportedly charged them higher insurance premiums based on information in their consumer credit reports but did not notify them of that fact, a possible violation of the Fair Credit Reporting Act, 15 U.S.C. §§ 1681–1681t. Consequently, they filed suit against Republic, alleging willful and negligent violations of that federal act. In response, Republic Mortgage, a non-signatory to the SouthStar mortgage lending agreement, containing the arbitration clause, moved to compel arbitration under that clause. *Brantley,* 424 F.3d at 394–95. The district court denied the motion.

Notwithstanding Republic's contention that its insurance contract was so intertwined with the lending contract that it should be entitled to enforce the latter's arbitration provision, the Fourth Circuit found that Republic could not satisfy either of the potential non-signatory applications of equitable estoppel and affirmed. Pointing out, first, that the Brantleys' claims invoked "a statutory remedy under the Fair Credit Reporting Act and [were] wholly separate from any action or remedy for breach of the underlying mortgage contract that is governed by the arbitration agreement," *Brantley,* 424 F.3d at 396, and, second, that "[a]lthough the mortgage insurance relate[d] to the mortgage debt, the premiums of the mortgage insurance [were] separate and wholly independent from the mortgage agreement," the Fourth Circuit held that the district court was correct in concluding that "the mere existence

---

6. Mortgage insurance should not be confused with mortgage life insurance, the type of credit life insurance which is at issue in the instant case. "Mortgage insurance obligates the insurer to underwrite the risk of default associated with the loan of the borrower," *Brantley v. Republic Mortgage Ins. Co.,* 424 F.3d 392, 394 n. 1 (4th Cir.2005), while mortgage life insurance obligates the insurer to underwrite the risk that a mortgagor might die prior to full payment of the note. Mortgage insurance is typically required by the lender when the loan-to-value ("LTV") exceeds a certain level, usually 80 per cent.

of a loan transaction requiring plaintiffs to obtain mortgage insurance cannot be the basis for finding their federal statutory claims, which [were] wholly unrelated to the underlying mortgage agreement, to be intertwined with that contract." *Id.*

Moreover, the Brantleys' claims did not, said the Fourth Circuit, "raise allegations of collusion or misconduct by SouthStar," but rather, were "based entirely on actions taken by Republic Mortgage, a non[-]signatory to the arbitration agreement," and, thus, equitable estoppel could not be justified on the ground that the claims alleged " 'substantially interdependent and concerted misconduct by both the non-signatory and one or more of the signatories to the contract.' " *Id.* (quoting *MS Dealer, supra,* 177 F.3d at 947) (internal citations and quotations omitted).

*Wachovia Bank, N.A. v. Schmidt, supra,* 445 F.3d 762, a case we discussed previously for its analysis of the "significant relationship test," also illustrates when a non-signatory cannot invoke an arbitration clause under equitable estoppel. That case, as we previously observed, involved a dispute between an investor, Schmidt, and his lender and financial advisor, Wachovia, arising from a failed investment in a "basis shifting" tax shelter which was subsequently invalidated by the Internal Revenue Service.

To implement the investment plan, Schmidt purchased a warrant in the stock of a Cayman Islands company which held a leveraged position in UBS stock. That warrant contained a broadly worded arbitration clause. *Id.* at 765–66 & n. 3. Wachovia was not a signatory to the warrant, though it provided financing and financial advice to Schmidt as part of the plan, and the loan documents contained a separate arbitration clause signed by both Schmidt and Wachovia.

As we previously noted, when Schmidt sued Wachovia for fraud, negligent misrepresentation, unfair trade practices, and related charges, Wachovia moved to compel arbitration, on the ground that the loan was significantly related to Schmidt's claims, an argument, which, as we previously noted, was

rejected by the Fourth Circuit on the ground that Schmidt was equitably estopped from denying the applicability of the arbitration clause in the warrant because he had received valuable benefits from that instrument.

In rejecting the latter argument as well, the Fourth Circuit observed that Schmidt had not "invoke[d] any rights under the terms of the [w]arrant," nor had he sought "to impose any of [its] obligations on Wachovia." *Id.* at 770. As for Wachovia's contention that Schmidt received benefits from the warrant, the federal appellate court observed that it was "not clear" that Schmidt received the benefits Wachovia had promised and that, in any event, Schmidt, as a signatory, did not "enjoy the pure windfall experienced by a non[-]signatory who receives only a contract's benefits." *Id.* at 771. The Fourth Circuit concluded that the "fact that a signatory receives benefits from a contract is ... insufficient, in and of itself, to estop it from asserting that a non[-]signatory is not entitled to invoke the contract's arbitration clause" and that Wachovia had "failed to establish any other inequitable conduct on [Schmidt's] part that justifie[d] an estoppel." *Id.*

■■■ The foregoing cases lead inexorably to the conclusion that appellees' invocation of the doctrine of equitable estoppel to compel the Griggses to arbitrate their dispute is unfounded. As in *Brantley,* 424 F.3d at 396, and as in *Schmidt,* 445 F.3d at 770, none of the allegations in the instant case against any of the appellees implicates a breach of a duty arising from the agreement which contains the arbitration rider. And, as in *Brantley,* it is undisputed that there has been no breach of the Mortgage Agreement by anyone. Moreover, as in *Brantley* and *Schmidt,* the Griggses' claims do not rely on their own rights or obligations under the Mortgage Agreement. Instead, all of the counts of the Griggses' final complaint are based on either the Griggses' rights under the credit life insurance policy or on alleged torts committed in procuring their agreement to purchase the policy.

In contrast, in *Case Handyman I,* the homeowners' entire case depended on their asserted rights under the contract

containing the arbitration clause; and, in *MS Dealer*, the car buyer's claims were "intimately founded in and intertwined with the obligations imposed by" the contract containing the arbitration clause. 177 F.3d at 948. Moreover, in *MS Dealer*, the arbitration clause at issue was incorporated by reference into the service contract that the car buyer contended she was fraudulently induced to sign, quite unlike here, where the credit life insurance policy disavowed incorporation by reference in its integration clause.

Thus, the Griggses' claims have, at most, an incidental relationship to the Mortgage Agreement, as the policy would not have been obtained in the absence of the Mortgage Agreement. Such an attenuated relationship is hardly sufficient to estop the Griggses from denying the applicability of the arbitration rider. *See Schmidt*, 445 F.3d at 770–71; *Brantley*, 424 F.3d at 396.

Furthermore, the Griggses' complaint does not allege any wrongdoing by Beneficial Mortgage, the signatory to the arbitration rider and Mortgage Agreement. Every claim concerns the allegedly fraudulent procurement of the Griggses' signatures on the contract for credit life insurance or the alleged breach of that contract by Household Life. Thus, as in *Brantley*, the claims in the instant case are "wholly separate from any action or remedy for breach of the underlying mortgage contract that is governed by the arbitration agreement." *Brantley*, 424 F.3d at 396. And, as in *Schmidt*, those claims do not "invoke any rights under the terms" of the Mortgage Agreement, nor do they "seek to impose any of [its] obligations on" any of the non-signatories. *Schmidt*, 445 F.3d at 770. Furthermore, although the credit life insurance "relates to the mortgage debt," the alleged breach of the policy is "separate and wholly independent from the mortgage agreement." *Brantley*, 424 F.3d at 396. The Mortgage Agreement and its arbitration rider are simply irrelevant to the claims in the Griggses' second amended and final complaint.

Moreover, in *Brantley*, the Fourth Circuit held that "the mere existence of a loan transaction requiring plaintiffs to

obtain mortgage insurance cannot be the basis for finding their federal statutory claims, which are wholly unrelated to the underlying mortgage agreement, to be intertwined with that contract." *Id.* Because the Griggses were permitted, but not required, to obtain credit life insurance, the mere existence of the Mortgage Agreement does not provide the basis for a finding that the Griggses' claims, which are wholly unrelated to the underlying Mortgage Agreement, are intertwined with that agreement.

Appellees next contend that they are also entitled to enforce the arbitration rider under an agency theory—that is, not as agents of Household Life, but as agents of Beneficial Mortgage, a signatory. This contention has no merit.

In *Westmoreland, supra,* 299 F.3d 462, 466, the Fifth Circuit declared that "a non[-]signatory cannot compel arbitration merely because he is an agent of one of the signatories." We agree, and, if the agent seeks to compel arbitration, he is, as the Fifth Circuit observed, "subject to the same equitable estoppel framework left to other non[-]signatories." *Id.* at 467.

Although, admittedly, some courts have held that an agent of a signatory may enforce an arbitration agreement. *See, e.g., Thomson–CSF, supra,* 64 F.3d at 776; *Davidson v. Becker,* 256 F.Supp.2d 377, 383–84 (D.Md.2003), we decline to so hold, here, for two reasons: First, the principal, Beneficial Mortgage, is not a party;[7] and second, the alleged actions of appellees Evans, Dailey, Kurlander, and Integrated were either on their own behalf, or to further the interests of a non-signatory, Household Life, rather than those of the signatory, Beneficial Mortgage. The scope of the claims does not, we observe, encompass the specific terms of the Mortgage Agree-

---

7. Although appellees cast this as a strategy of artful pleading meant to evade enforcement of the arbitration rider, we disagree. The Griggses' claims are similar to those in *Brantley, supra,* 424 F.3d 392, a case in which the Fourth Circuit held that claims regarding a mortgage insurance contract did not fall under the arbitration agreement contained, as here, in a separate mortgage lending agreement.

ment, and Mrs. Griggs does not seek to enforce any rights under that separate transaction.

Indeed, where courts have permitted a non-signatory agent to enforce an arbitration agreement executed by his principal, the claims must relate to the agent's actions on behalf of the principal to trigger the arbitration agreement. *See, e.g., Letizia v. Prudential Bache Secs., Inc.,* 802 F.2d 1185, 1186–87 (9th Cir.1986) (holding that brokerage employees accused of churning customer's account could enforce arbitration agreement between customer and principal); *Kruse v. AFLAC Int'l, Inc.,* 458 F.Supp.2d 375, 382–84 (E.D.Ky.2006) (holding that agent may enforce arbitration agreement executed by principal when agent was sued for actions taken in capacity as employee or agent); *Rowe v. Exline,* 153 Cal.App.4th 1276, 1284–85, 63 Cal.Rptr.3d 787 (2007) (holding that non-signatory sued either as the agent or alter ego of a signatory may enforce arbitration agreement executed by signatory corporation). *See also InterGen N.V. v. Grina,* 344 F.3d 134, 147–48 (1st Cir.2003) (holding that agent may commit its non-signatory principal to an arbitration agreement, but only if the principal-agent relationship is relevant to the legal obligation in dispute); *Britton v. Co-op Banking Group,* 4 F.3d 742, 748 (9th Cir.1993) (holding that agent may not enforce arbitration agreement executed by his principal because acts alleged were "subsequent, independent acts of fraud, unrelated to any provision or interpretation of the contract" and thus "do not impose any contractual liability, vicariously or otherwise, upon" agent).

In sum, the claims do not relate to any of the appellees' actions on behalf of Beneficial Mortgage, but only to their actions on behalf of Household Life and Integrated Real Estate, and it is simply irrelevant that Evans and Dailey happened to be actual or apparent agents of Beneficial. Therefore, appellees, all of whom are non-signatories, may not enforce the arbitration rider as agents of Beneficial.

## ORDER OF THE CIRCUIT COURT FOR BALTIMORE CITY COMPELLING ARBITRATION AND STAYING

PROCEEDINGS VACATED. CASE REMANDED FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY APPELLEES.