**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 24-1817**

---

SHAMIA FRANKLIN; DEVON CHAPMAN, individually and on behalf of all others similarly situated,

        Plaintiffs – Appellees,

    v.

CLEO AI INC.,

        Defendant – Appellant.

---

Appeal from the United States District Court for the District of Maryland, at Baltimore. J. Mark Coulson, Magistrate Judge. (1:24-cv-00146-JMC)

---

Submitted: April 2, 2025                       Decided: May 30, 2025

---

Before DIAZ, Chief Judge, and WYNN and THACKER, Circuit Judges.

---

Affirmed by unpublished per curiam opinion.

---

**ON BRIEF:** Bruce P. Merenstein, Abigail T. Burton, WELSH & RECKER, P.C., Philadelphia, Pennsylvania, for Cleo. Kevin Joseph Abramowicz, Kevin William Tucker, EAST END TRIAL GROUP LLC, Pittsburgh, Pennsylvania, for Appellees.

---

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Cleo AI Inc. ("Cleo") appeals the district court's order denying its motion to compel arbitration. Because we conclude that Cleo cannot compel arbitration as a third party to the arbitration agreement, we affirm.

## I.

Cleo is a technology company in New York that provides loans and cash advances to Maryland consumers through its mobile app (the "Cleo App"). At the relevant time herein, Cleo contracted with Synapse Financial Technologies, Inc. ("Synapse") in order to effectuate electronic fund transfers ("EFT") for cash advances and loans. Devon Chapman ("Appellee") signed up for Cleo's lending services using the Cleo App on November 28, 2019. During the signup process, Appellee was "required to click a button stating that he agreed to [Cleo's] terms and conditions." J.A. 98.[1] The phrase "terms and conditions" was hyperlinked so that, if clicked, it would lead to Cleo's then current terms and conditions. Appellee "was not required to [click on] that hyperlink in order to agree to the terms and conditions, but he was nevertheless unable to proceed with establishing his account until he clicked the box indicating that he agreed to the terms and conditions." *Id.* at 98–99.

At the time Appellee signed up for the Cleo App, Cleo's terms and conditions stated: "Your salary advance payments and repayments are processed by our loan provider Synapse. By using a salary advance you agree to {https://synapsefi.com/tos-evolve]

---

[1] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

Synapse's Terms of Service." J.A. 66; 99. Synapse's then current Terms of Service were also hyperlinked. Those Terms of Service included a binding arbitration provision: "Any controversy or claim arising out of or relating to these Terms of Service, or the breach thereof, shall be settled by arbitration administered by the American Arbitration Association in accordance with its Commercial Arbitration Rules . . . ." *Id.* at 90. Synapse's Terms of Service also provided that they "are governed by the laws of the State of California." *Id.* at 91.

Appellee signed up for the Cleo App and used Cleo's lending services to obtain salary advances. On January 16, 2024, Appellee sued Cleo in the District of Maryland, individually and on behalf of all others similarly situated, alleging violations of the Maryland Consumer Loan Law, Md. Com. Law §§ 12-301, et seq. (Count I); the Truth in Lending Act, 15 U.S.C. §§ 1601, et seq. (Count II); the Electronic Funds Transfer Act, 15 U.S.C. §§ 1693, et seq. (Count III); and the Maryland Consumer Protection Act, Md. Com. Law §§ 13-101, et seq. (Count IV). Count I is based on Appellee's allegations that Cleo is not licensed under the Consumer Loan Law in Maryland. Count II is based on Appellee's claim that Cleo misleads consumers by not disclosing the total cost of the loans it offers or the true annual percentage rate. Count III is based on Appellee's claim that the Electronic Funds Transfer Act does not allow a lender to "condition[] its extension of credit on repayment by means of preauthorized transfers," as Cleo allegedly does. And Count IV is based on Appellee's claim that all of the alleged conduct constitutes unfair, abusive, or deceptive trade practices pursuant to the Maryland Consumer Protection Act.

Appellee did not name Synapse as a defendant. In fact, the complaint does not

3

mention Synapse or its part in effectuating the EFTs at all. Nevertheless, Cleo moved the district court to compel arbitration of Appellee's claims against it, relying on the binding arbitration agreement contained in Synapse's Terms of Service. Cleo argued that Appellee should be equitably estopped from refusing to abide by the agreement to arbitrate claims "arising out of or relating to" Synapse's Terms of Service because Synapse's services were a necessary prerequisite to Appellee receiving advances from Cleo. J.A. 90.

The district court denied Cleo's motion, concluding that equitable estoppel did not entitle Cleo, as a non-signatory, to enforce Appellee's arbitration agreement with Synapse.[2]

Cleo timely filed this appeal.

## II.

Typically, we "review[] de novo a district court's order denying a motion to compel arbitration." *Minnieland Private Day Sch., Inc. v. Applied Underwriters Captive Risk Assurance Co.*, 867 F.3d 449, 453 (4th Cir. 2017). But, as is the case here, when "the district court's decision is based on principles of equitable estoppel, we review the district court's decision for abuse of discretion." *Am. Bankers Ins. Grp. v. Long*, 453 F.3d 623, 629 (4th Cir. 2006); *see also Wachovia Bank, Nat. Ass'n v. Schmidt*, 445 F.3d 762, 767 (4th Cir. 2006). "A district court abuses its discretion when it acts arbitrarily or irrationally, fails to consider judicially recognized factors constraining its exercise of discretion, relies

---

[2] The district court considered both Maryland law, because Maryland was the forum state, and California law, given the forum selection clause in the Synapse agreement, and reached the same conclusion as to both states.

4

on [clearly] erroneous factual or legal premises, or commits an error of law." *United States v. Delfino*, 510 F.3d 468, 470 (4th Cir. 2007).

## III.

The Federal Arbitration Act provides for "the enforcement of agreements to arbitrate when they are created by contract, and such contracts must be treated like any other contract under applicable state law." *Rogers v. Tug Hill Operating, LLC*, 76 F.4th 279, 285 (4th Cir. 2023) (emphasis omitted). "Because traditional principles of state law allow a contract to be enforced by or against nonparties to the contract through assumption, piercing the corporate veil, alter ego, incorporation by reference, third-party beneficiary theories, waiver[,] and estoppel," nonparties to a written arbitration agreement may nonetheless be able to enforce it. *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 631 (2009) (cleaned up). Here, Cleo argues that it is entitled to enforce Appellee's arbitration agreement with Synapse based only on the theory of equitable estoppel.

## A.

State law contract principles determine whether a non-signatory can enforce a contract, and thus an arbitration agreement, through equitable estoppel. *See Arthur Andersen*, 556 U.S. at 629–32. While the district court considered equitable estoppel pursuant to the laws of both Maryland and California, only Maryland law is relevant here. Choice of law provisions are a contractual right that, like the arbitration agreement itself, may not generally be invoked by a nonparty to the contract. *See id.* Therefore, until it has been established that Cleo has a right to enforce the Synapse contract, we cannot apply the choice of law provision in the Synapse Terms of Service. And to make that determination,

5

we apply the law of the forum state. *See Johnson v. Continental Finance Co., LLC*, 131 F.4th 169, 178 (4th Cir. 2025) ("We cannot apply *any* provision of the contract, including its choice-of-law clause, before deciding if the parties formed an agreement." (emphasis in original)). Here, Maryland is the forum state. Therefore, we must apply Maryland law in order to determine whether Cleo has any right to enforce the contract between Appellee and Synapse.

### B.

Pursuant to Maryland law, the "basis" of equitable estoppel is the "effect of the conduct of one party on the position of the other party and that the estopped party is therefore absolutely precluded both at law and in equity, from asserting rights which might perhaps have otherwise existed against another person, who has in good faith relied upon such conduct." *Dickerson v. Longoria*, 995 A.2d 721, 742 (Md. 2010) (cleaned up). In simpler terms, "[t]he doctrine of equitable estoppel is rooted in the equitable principle that it would be unfair for a party to rely on a contract when it works to its advantage, and repudiate it when it works to its disadvantage." *Griggs v. Evans*, 43 A.3d 1081, 1092 (Md. App. 2012) (cleaned up).

### 1.

Equitable estoppel permits non-signatories to enforce an arbitration provision in two instances under Maryland law. The first is "when a signatory must rely on the terms of the written agreement containing the arbitration clause in asserting its claims *and* seeks to claim the benefit of such an agreement while simultaneously attempting to avoid the terms of an arbitration provision contained therein." *Griggs*, 43 A.3d at 1092 (cleaned up)

6

(emphasis supplied); *see also Schuele v. Case Handyman and Remodeling Srvs., LLC*, 989 A.2d 210, 214 n.3 (Md. 2010). And the second is "when the signatory to the contract containing an arbitration clause raises allegations of substantially interdependent and concerted misconduct by both the non-signatory and one or more of the signatories to the contract." *Griggs*, 43 A.3d at 1092 (cleaned up). In other words, "when the issues the non-signatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed." *Id.* (cleaned up).[3]

Here, the district court determined,

> Under the above Maryland standards, [Appellee's] claims do not rely on the language or construction of Synapse's terms and conditions; [Appellee] does not seek to benefit from certain provisions of Synapse's terms and conditions while disowning his obligations under others; and [Appellee] raises no allegations that [Cleo] and Synapse engaged in any interdependent and/or concerted misconduct giving rise to [Appellee's] claims.

J.A. 103. The district court also pointed out that "the Synapse arbitration clause [is] limited to 'Any controversy or claim arising out of or relating to *these* Terms of Service, or the breach thereof,' which would not apply to [Appellee's] claims regarding [Cleo's] allegedly improper financial practices." *Id.* (emphasis supplied). Therefore, the district court

---

[3] The parties dispute whether, under Maryland law, detrimental reliance is an independent requirement for invoking equitable estoppel. But we need not wade into that question because Cleo does not satisfy either of the above avenues to non-signatory enforcement of the arbitration agreement. That is, Cleo has not established that Appellee's claims rely on or are inextricably intertwined with the Synapse agreement.

determined that Cleo was not entitled to enforce the arbitration agreement between Appellee and Synapse.

Upon review, we conclude that the district court did not "act[] arbitrarily or irrationally, fail[] to consider judicially recognized factors constraining its exercise of discretion, rel[y] on [clearly] erroneous factual or legal premises, or commit[] an error of law." *United States v. Delfino*, 510 F.3d 468, 470 (4th Cir. 2007). To the contrary, the district court considered the relevant law and correctly determined that Appellee's claims against Cleo did not rely on the Synapse agreement or allege misconduct intertwined with the Synapse agreement.

2.

Appellee's claims have nothing to do with Synapse. In order for Cleo to invoke the first path to equitable estoppel, Appellee's claims that Cleo engaged in deceptive and unfair trade practices and violated various consumer protection and banking/loan laws must rely "on the terms of the written agreement containing the arbitration clause." *Griggs*, 43 A.3d at 1092 (cleaned up). They do not. Nor does Appellee "seek[] to claim the benefit of such an agreement while simultaneously attempting to avoid the terms of an arbitration provision contained therein." *Id.* Cleo argues that Appellee *did* obtain the benefit of the agreement by obtaining Cleo's loan services. But "[t]he fact that a signatory receives benefits from a contract is. . . . insufficient, in and of itself, to estop it from asserting that a non-signatory is not entitled to invoke the contract's arbitration clause." *Wachovia*, 445 F.3d at 771. Rather, to be estopped from denying the applicability of the arbitration

8

agreement, Appellee's *claims* would have to be both seeking the benefit of the Synapse agreement *and* trying to disclaim the arbitration provision. That is not the case here.

As to the second path to invoke equitable estoppel, Appellee does not "raise[] allegations of substantially interdependent and concerted misconduct by both the non-signatory and one or more of the signatories to the contract." *Griggs*, 43 A.3d at 1092 (cleaned up). That is, Appellee's claims do not allege that Cleo and Synapse undertook the alleged misconduct in an "interdependent and concerted" manner. In fact, Appellee does not allege Synapse engaged in misconduct at all. Rather, as explained above, Appellee's claims are based entirely on his allegations that Cleo's predatory lending practices and unlicensed status violate various state and federal consumer protection and banking laws.

In an effort to avoid these conclusions, Cleo argues that Appellee's claims necessarily arise out of and are intertwined with the Synapse agreement because Appellee could not have obtained Cleo's services without agreeing to Synapse's Terms of Service. But, Maryland law makes clear that this type of relationship is insufficient for Appellee to invoke equitable estoppel.

In *Griggs*, for example, the Griggses sued the carrier of their mortgage insurance policy. That carrier, a non-signatory to the Griggses' mortgage agreement, sought to enforce an arbitration clause contained in the mortgage agreement. The Griggses argued that the arbitration clause did not apply to their claims, while the non-signatory argued the Griggses should be equitably estopped from denying the arbitration clause. The court held, "the Griggses' claims ha[d], at most, an incidental relationship to the Mortgage Agreement,

9

as the [mortgage insurance] policy would not have been obtained in the absence of the Mortgage Agreement." *Griggs*, 43 A.3d at 1096. "Such an attenuated relationship is hardly sufficient to estop the Griggses from denying the applicability of the arbitration rider." *Id.* (citations omitted). Significantly, the court noted that *Griggs* differed from *Case Handyman*, where the plaintiffs' claims "depended on their asserted rights under the contract containing the arbitration clause," such that the non-signatory defendant was entitled to enforce the arbitration agreement. *Id.* (citing *Case Handyman and Remodeling Srvs., LLC v. Schuele*, 959 A.2d 833, 844 (Md. App. 2008), reversed and remanded on other grounds in *Schuele v. Case Handyman and Remodeling Srvs., LLC*, 989 A.2d 210 (Md. 2010)).

The argument Cleo makes here is nearly indistinguishable from the one the mortgage insurer made in *Griggs*. According to Cleo, Appellee could not have obtained Cleo's services if he did not agree to Synapse's arbitration agreement. So, in Cleo's view, any claim Appellee makes against Cleo necessarily arises from, or is inextricably intertwined with, the Synapse agreement. As in *Griggs*, this "incidental" and "attenuated" relationship is hardly sufficient to estop [Appellee] from denying the applicability of the arbitration [agreement]." 43 A.3d at 1096.

Cleo also argues that the language in the Synapse Terms of Service -- requiring arbitration of "[a]ny controversy or claim arising out of or relating to these Terms of

Service, or the breach thereof," J.A. 90 -- is "broad,"[4] such that it "embraces every dispute between parties having a significant relationship to the contract regardless of the label attached to the dispute." Opening Br. at 18–19 (citation omitted). Cleo is correct that Maryland employs a "significant relationship" test to "determine whether an arbitration . . . provision applies to a dispute that does not arise from the governing contract." *Griggs*, 43 A.3d at 1088. But, pursuant to that test, "when a significant relationship exists *between the asserted claims and the contract* in which the arbitration clause is contained, those claims must be submitted to arbitration." *Id.* (emphasis supplied) (cleaned up). Here, too, Maryland courts have confirmed that "claims arising under a contract, which is transactionally related to another contract containing a broadly worded arbitration clause, are not necessarily 'significantly related'" to the contract containing that arbitration clause, and "application of the 'significant relationship test' does not always require arbitration of such claims." *Id.* at 1090. Instead, Maryland determines whether the *claims* themselves have a significant relationship with the contract containing the arbitration agreement. And as we have explained, Appellee's claims have no relationship with Synapse or Synapse's Terms of Service.

## IV.

The district court did not abuse its discretion, and its order denying Cleo's motion to compel arbitration is

---

[4] There is no dispute that the language here requiring arbitration of any claim "arising from or relating to" Synapse's Terms of Service is "broad" under the relevant law.

11

*AFFIRMED.*