***Kyere, Jr. v. Durand, et al.***
No. 261, Sept. Term, 2024
Opinion by Leahy, J.

**Arbitration > Agreement to Arbitrate**
The Supreme Court of Maryland has recognized that "consideration of a motion to compel arbitration may involve two separate, and distinct, issues: (1) whether an agreement to arbitrate exists; and (2) whether a particular dispute falls within the scope of the arbitration agreement." *Access Funding, LLC v. Linton*, 482 Md. 602, 642 (2022). When reviewing a circuit court's decision to compel arbitration, our primary focus must remain squarely on the first issue. *See id.*

**Arbitration > Agreement to Arbitrate > Agency**
"Courts have permitted a non-signatory agent to enforce an arbitration agreement executed by his principal" when the claims asserted against the agent "relate to the agent's actions on behalf of the principal." *Griggs v. Evans*, 205 Md. App. 64, 92 (2012),

**Arbitration > Agreement to Arbitrate > Agency**
The doctors employed by LifeBridge ("Appellees") had standing to compel arbitration under the arbitration clause in Dr. Kyere's employment agreement because Dr. Kyere alleged that LifeBridge and the Appellees had engaged in substantially interdependent and concerted misconduct, and because the claims against them were based on acts they allegedly committed as employees and agents of LifeBridge within the agency relationship that existed between Medical Staff and LifeBridge. *Griggs v. Evans*, 205 Md. App. 64, 83, 92 (2012).

**Arbitration > Agreement to Arbitrate > Scope of Arbitration Clause**
Even though "it is initially for the courts to determine whether the subject matter of a dispute falls within the scope of the arbitration clause[,]" we will only do so if the scope of the clause is clear. *Allstate Ins. Co. v. Stinebaugh*, 374 Md. 631, 643 (2003). "[W]hen the language of an arbitration clause is unclear as to whether the subject matter of the dispute falls within the scope of the arbitration agreement, . . . the question of substantive arbitrability initially should be left to the decision of the arbitrator." *Gold Coast Mall, Inc. v. Larmar Corp.*, 298 Md. 96, 107 (1983).

**Arbitration > Agreement to Arbitrate > Scope of Arbitration Clause**
When an arbitration clause broadly calls for the arbitration of any and all disputes arising out of the contract, all disputes are considered to be arbitrable "unless expressly and specifically excluded," thereby "promot[ing] the legislative policy favoring arbitration and leav[ing] the issue of arbitrability to the arbitrators." *Crown Oil & Wax Co. of Delaware v. Glen Constr. Co. of Virginia*, 320 Md. 546, 560 (1990).

**Arbitration > Agreement to Arbitrate > Arbitrability of Claim**

The arbitrability of a claim "turns on the factual allegations encompassed" in that claim, rather than "the legal causes of action" asserted. *The Redemptorists v. Coulthard Servs., Inc.*, 145 Md. App. 116, 151 (2002). To the extent that the factual allegations encompassed in a claim create ambiguity as to whether the arbitration agreement applies to that claim, then under the *Crown Oil* framework, the arbitrability of that claim must be addressed by the arbitrator, not the court. *Crown Oil & Wax Co. of Delaware v. Glen Constr. Co. of Virginia*, 320 Md. 546, 559–60 (1990).

**Arbitration > Agreement to Arbitrate > Arbitrability of Claim**

Under the Supreme Court of Maryland's approach to arbitrability, as presented in *Gold Coast Mall* and *Crown Oil*, when it is unclear whether particular claims are within the scope of an arbitration agreement, the determination of arbitrability of the claims must be left to the skilled judgment of the arbitrator. *Allstate Ins. Co. v. Stinebaugh*, 374 Md. 631, 643 (2003). Here, the arbitrator may, at the outset of arbitration, address any questions about whether the factual allegations encompassed in any particular claim(s) contained in the amended complaint render the claim(s) outside the scope of the arbitration clause.

Circuit Court for Baltimore City
Case No. 24-C-23-005020

REPORTED

IN THE APPELLATE COURT

OF MARYLAND

No. 0261

September Term, 2024

_____

SAMPSON K. KYERE, JR., MD, PHD

v.

DANIEL DURAND, MD, ET AL.

_____

Berger,
Leahy,
Getty, Joseph M.
    (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Leahy, J.

_____

Filed: February 27, 2026

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

Appellant, Dr. Sampson Kyere, appeals an order of the Circuit Court for Baltimore City entered March 25, 2024, compelling him to arbitrate certain claims against Drs. Daniel Durand, Elizabeth Zadzielski, and Omar Zalatimo (collectively, "Appellees"). Dr. Kyere was employed by Sinai Hospital of Baltimore, Inc., ("Sinai" or the "Hospital"), a subsidiary of LifeBridge Health, Inc. ("LifeBridge"), pursuant to an employment agreement effective June 1, 2021.

Dr. Kyere was granted clinical privileges to practice medicine at Sinai by Sinai's Board of Directors upon the recommendation of the "Sinai Hospital Medical Staff Association, P.A." ("Medical Staff"). As identified in Article I of the "Medical Staff Bylaws 2021," ("Bylaws"), the Medical Staff is a subordinate corporation organized to, among other things, "assume overall responsibility for the quality of professional services provided by individuals with clinical privileges" at Sinai, and to "perform peer review and make recommendations" to Sinai and its Board of Directors regarding clinical privileges of its Members. During his employment with LifeBridge, Dr. Kyere was also a member of the Medical Staff.

On November 27, 2023, Dr. Kyere filed a ten-count complaint against LifeBridge and the Appellees seeking declaratory and monetary relief. In his First Amended Complaint ("Complaint"),[1] Dr. Kyere asserted that, after developing a condition that impacted his gait, he requested a modified work schedule from LifeBridge to allow time

---

[1] Dr. Kyere amended this complaint on December 6, 2023, prior to serving it on LifeBridge and the Appellees.

for treatment. Dr. Kyere averred that although LifeBridge granted his request, LifeBridge and the Appellees thereafter subjected him to a series of retaliatory actions, which culminated in his constructive dismissal on September 15, 2022.

On January 5, 2024, LifeBridge and the Appellees filed a Motion to Compel Arbitration of all claims asserted in Dr. Kyere's Complaint. In support of this motion, LifeBridge and the Appellees argued that all of the claims in the Complaint were subject to an arbitration clause in Dr. Kyere's employment agreement. Dr. Kyere filed an opposition to this motion on January 18, insisting that there was no basis for compelling him to arbitrate his claims against the Appellees or, with the exception of a claim for breach of the employment agreement, his claims against LifeBridge. Dr. Kyere argued that none of the Appellees were a party to his employment agreement in an individual capacity, and that his claims against the Appellees were made based on actions they took outside the scope of their employment with LifeBridge.

Following a hearing on March 18, 2024, the circuit court granted the motion to compel arbitration in an oral ruling on the record. It was, and remains, undisputed that the arbitration clause in Dr. Kyere's employment agreement applies to all disputes arising out of his employment with LifeBridge. The court determined that all of the claims in Dr. Kyere's Complaint arose from his employment, and that there was a significant relationship between Dr. Kyere's claims against LifeBridge and his claims against the Appellees. The court further ruled that the Appellees had standing to compel arbitration because Dr. Kyere's allegations against them were interconnected with his allegations against LifeBridge. The court entered an order reflecting this ruling on March 25.

2

Dr. Kyere filed a notice of appeal in this Court on April 3, 2024, and then amended his notice several months later to withdraw the appeal as to LifeBridge. He presents this Court with the singular issue: "Did the circuit court err in compelling Dr. Kyere to arbitrate his claims against the Appellees?"[2]

We hold that the circuit court did not err in granting the Appellees' motion to compel arbitration. The claims against them concern actions taken by them within the scope of an agency relationship with LifeBridge as employees of LifeBridge, a signatory to the employment agreement. Accordingly, we conclude that none of Dr. Kyere's claims against the Appellees are clearly "beyond the scope of the arbitration clause at issue." *Gannett Fleming, Inc. v. Corman Constr., Inc.*, 243 Md. App. 376, 401 (2019). Our conclusion is reinforced by Dr. Kyere's allegations that the Appellees, as officers and employees of LifeBridge, engaged in substantially *interdependent* and concerted misconduct *with* LifeBridge.

Although we hold that Appellees were entitled to compel arbitration under the arbitration clause in Dr. Kyere's employment agreement, we also construe the arbitration clause as "broadly worded, leaving vague the precise bounds of its scope" over various

---

[2] Dr. Kyere presents the question in his brief as follows:

Whether the Circuit Court erroneously compelled Appellant to arbitrate his claims against Appellees based on an arbitration provision contained in his employment agreement with LifeBridge Health, when Dr. Kyere had no agreement to arbitrate with Appellees who were neither signatories nor parties to the employment agreement and all claims against them emanated from a separate contract – the Bylaws – and for conduct they engaged in as members and officers of the Medical Staff, not as employees or agents of LifeBridge?

claims. *Id.* at 403. In line with applicable decisional law, the arbitrability of specific claims in Dr. Kyere's Complaint must first be resolved by the arbitrator.

## BACKGROUND

### *Dr. Kyere's Employment Agreement*

LifeBridge is a hospital group that operates several acute medical care centers in Maryland, including Sinai. Dr. Kyere first began working for LifeBridge in June 2016 and has primarily worked as a radiologist at Sinai during his time with the hospital group. The Appellees are also doctors, each employed by LifeBridge during Dr. Kyere's time at Sinai. From June 1, 2021, onward, Dr. Kyere's employment with LifeBridge was governed by a "letter of agreement" between Dr. Kyere and Sinai. This letter of agreement, which incorporates the "Standard Terms and Conditions Governing the Employment of Members of the Sinai Hospital Facility" ("Standard Terms"), constitutes Dr. Kyere's employment agreement.[3] The Standard Terms contain an arbitration clause, which reads as follows:

*Dispute Resolution*

Most disagreements between honorable people can be resolved through negotiations conducted in good faith. Furthermore, even if the parties are unable to reach an agreement on their own, informal arbitration is more likely to produce a timely and fair resolution than are formal judicial proceedings.

---

[3] Although Sinai, a distinct entity from and subsidiary of LifeBridge, is Dr. Kyere's employer under the employment agreement, all parties have treated LifeBridge and Sinai as essentially synonymous throughout this litigation.

4

Accordingly, except for injunctive relief for actual or threatened violations of Sections 12 and 13[4] as provided above, **the exclusive method for resolving any controversy or claim arising out of a physician's employment, including any termination or nonrenewal, will be as set out below**. **These provisions supersede any other grievance procedure for Hospital employees provided under the Hospital's regular personnel policies.**

If a dispute arises between the Hospital and a physician, the physician and a representative of the Hospital will meet informally within seven days to discuss the areas of disagreement and negotiate in good faith regarding possible solutions. As part of this dispute resolution process, the party raising the issue will, if the other so requests, provide a short and plain written statement setting forth that party's position regarding the dispute and that party's suggested resolution. The other party will provide a written response within 15 days, and the parties will then negotiate with each other for a period of at least 15 days in an effort to resolve the controversy.

If that process is unsuccessful in resolving the dispute, and either the physician or the Hospital wishes to continue the dispute resolution process, the **dispute must be submitted to arbitration**. The arbitration will be conducted by a single arbitrator, under the alternative dispute resolution procedures of the American Health Lawyers Association ("AHLA"). The authority of the arbitrator will be limited to a determination of the facts, and to the interpretation and application of specific provisions of the physician's Letter of Agreement and this document as they may apply to the issue. The arbitrator will be bound by the terms of the Letter of Agreement and this document, and will have no authority to add to, subtract from, amend, or modify their terms. The arbitrator will render an opinion and a final award in accordance with the Maryland Uniform Arbitration Act, and the arbitrator's award may be entered in any court having jurisdiction.

Each party will bear its own fees, costs, and expenses of an arbitration proceeding, including costs of witnesses, travel, attorneys, and other representatives. Unless otherwise required by AHLA rules or the decision of an AHLA arbitrator, the general costs and expenses of the arbitration, such as facility rental fees and the costs and expenses of the arbitrator and the AHLA, will be shared equally by the physician and the Hospital.

---

[4] Sections 12 and 13 of the "standard terms and conditions" impose certain nonsolicitation, noncompetition, and confidentiality obligations on Sinai physicians. They are not at issue in this appeal.

If the dispute involves a termination of the physician's employment, the effective date of the termination will not be postponed or otherwise affected by the pendency of any arbitration proceedings.

(Emphasis added).

The Standard Terms provide that Sinai "is a subsidiary of LifeBridge . . . . As used in these standard terms and conditions, an 'affiliate' of Sinai means any entity that is owned or controlled, directly or indirectly, by LifeBridge." The Standard Terms further state that Sinai "may assign its rights and obligations as a physician's employer to any affiliate" of Sinai or LifeBridge and define an "affiliate" as "any entity that is owned or controlled, directly or indirectly, by LifeBridge."

### *Medical Staff Bylaws*

As noted, during his employment, Dr. Kyere was a member of the Medical Staff. Article I of the Bylaws provides that the purposes of the Medical Staff include:

A. to assume overall responsibility for the quality of professional services provided by individuals with clinical privileges, as well as the responsibility of accounting therefore to the governing body;
B. to provide health care and related services to residents of central Maryland and surrounding areas;

\*\*\*

F. to facilitate communication among the Medical Staff, the Board of Directors, and the Hospital;
G. to perform peer review and make recommendations regarding the clinical privileges of Members[.]

Article III, which governs the Medical Staff membership, provides that the "[i]nitial appointments and reappointments to the Medical Staff *are made by the Board of Directors*" of Sinai, following the Medical Staff's recommendation. (Emphasis added). It further provides that "[a]ll applications for initial appointment and reappointment . . . *are*

6

*evaluated in light of the needs of the Hospital* and the community and *the Hospital's ability* to accommodate the expectation of the applicant." (Emphasis added). Once appointed to the Medical Staff, a practitioner "may only practice within the delineated clinical privileges recommended by the Medical Staff and *approved by the Board of Directors*" of Sinai in accordance with the Bylaws. (Emphasis added). Additionally, Article III authorizes the President of the Medical Staff to recommend that the President of Sinai grant certain time-limited and specialized privileges to a practitioner who is not a member of the Medical Staff, but these privileges could be terminated by "[t]he President of [Sinai] . . . without right of appeal, at any time or effective as of the discharge from the Hospital of the practitioner's patient."

Article VII of the Bylaws establish a medical executive committee ("MEC"), which is "responsible for making Medical Staff recommendations directly *to the Board of Directors [of Sinai]* for its approval." (Emphasis added). The impaired physician committee ("IPC") is a subcommittee of the MEC, and operates as an "ad-hoc committee" whose membership "consist[s] of five Medical Staff members, the President of the Hospital or his/her designee, the President of the Medical Staff, and the Chief of the Department of the involved Member[.]" According to the Bylaws, the IPC serves "to carry out the activities outlined in the Impaired Practitioner Policy to include matters of physical and mental health[.]"

The Impaired Practitioner Policy defines "impaired practitioner" as "one whose ability to practice medicine with reasonable skill and safety is impaired because of a physical, psychiatric, or emotional illness[.]" It also outlines the procedures for addressing

7

an impaired practice allegation, providing: "[w]henever a practitioner is suspected of being impaired or providing unsafe treatment resulting from impairment, a confidential report of the facts and practitioner behavior which led to such suspicion shall be made to the appropriate Department Chief." The IPC recommendations are ultimately sent to the MEC, which, in turn, makes recommendations *to the Board of Directors of Sinai* as to whether "the practitioner's privileges should be suspended, terminated, or limited in any way[.]" Article XI of the Bylaws specifies that "[t]he Board of Directors has the authority to suspend, expel, limit or take other corrective actions with regard to a practitioner's clinical privileges or Medical Staff membership at any time."

### *Events Leading to the Lawsuit*

According to the allegations set forth in the Complaint, the following events led to the filing of the underlying lawsuit.

In October of 2021, Dr. Kyere met with Dr. Durand, his immediate supervisor, to "explain to him that he had been experiencing lumbar spine pain which was affecting his gait" and inform him that he "was working with treating physicians to obtain treatment for his condition." Several months later, on March 1, 2022, Dr. Kyere requested "a reasonable accommodation of a modified work schedule of three days per week, in lieu of five days, on advice of his treating physician." According to Dr. Kyere, it then "became immediately apparent that Dr. Durand preferred Dr. Kyere take leave under the Family Medical Leave Act (FMLA) or use his PTO in lieu of obtaining a modified work schedule." On April 1, 2022, Dr. Kyere was informed by counsel for LifeBridge that he would receive the accommodation he had requested, and that Dr. Durand would "email Dr. Kyere to

8

memorialize" his three-day work schedule. However, Dr. Durand instead called him that evening and informed him "that a lead ultrasound technician reported she observed Dr. Kyere having dexterity issues during a procedure." Dr. Durand allegedly informed Dr. Kyere that "he consulted with legal counsel and hospital leadership and there was a consensus to retain an independent" radiologist "to observe Dr. Kyere performing procedures to ensure Dr. Kyere was not a threat to patient safety."

Dr. Kyere was again contacted by Dr. Durand on April 8, 2022, and informed that he was being reassigned to work primarily at Northwest Hospital, instead of Sinai, even though he had previously only provided "evening and weekend call coverage" at Northwest Hospital or filled in "when the assigned Interventional Radiologist at Northwest Hospital was absent." Dr. Durand allegedly also "began having Dr. Kyere scheduled to provide diagnostic coverage in lieu of interventional radiology coverage even though Dr. Kyere was hired as the Medical Director for Interventional Radiology and his employment contract did not outline any diagnostic radiology responsibilities."

Dr. Kyere informed LifeBridge that "he would not consent to an observation" based on LifeBridge's "articulated basis for an observation." LifeBridge notified Dr. Kyere that it intended to schedule an observation anyway, along with "an additional 'independent observation' of Dr. Kyere that would take place the week of May 2, 2022." On April 19, 2022, Dr. Kyere's attorneys sent LifeBridge a "detailed letter," in which they asserted that "taking any employment action based on" the ultrasound technician's report would be unlawful. Dr. Kyere requested an "alternative resolution" to observation the same day. The following day, LifeBridge informed Dr. Kyere that it had canceled "all scheduled

9

observations," but that concerns about Dr. Kyere's condition would be "shared with the President of the Medical Staff, pursuant to Sinai's Impaired Practitioner Policy."

On May 12, 2022, Dr. Zadzielski, Chair of the IPC, sent Dr. Kyere a letter informing him that the IPC had been "convened on May 6, 2022 to review and discuss concerns regarding progressive changes in gait and mobility[.]" The letter stated that Dr. Durand had referred these concerns to Dr. Zalatimo, who was "President of the Medical Staff[,] per the Sinai Medical Staff Bylaws and IPC policy." In his Complaint, Dr. Kyere alleged that, "[t]o undergo evaluation under this program, [he]would be required to release five years of medical records and undergo a two-day, intensive medical examination[.]" He would also have to complete forms on which he would have to disclose personal facts that were not related to his disability. Dr. Kyere's attorneys responded by asking LifeBridge to reconsider the decision to convene the IPC and its requests for an evaluation, but the IPC replied that it "was not willing to alter its requests[.]" Around the same time, LifeBridge sent Dr. Kyere a proposed amended version of his employment agreement which, in addition to changing the structure of his compensation and PTO, "preclude[ed] him from taking additional calls although his original employment agreement permitted him to do so; restrict[ed] him from moonlighting for American Radiology although the previous agreement permitted him to do so; and alter[ed] his clinical schedule with a mandatory start time."

On May 17, 2022, Dr. Kyere informed LifeBridge that he was "agreeable to the changes to his compensation and PTO," but that he would not accept any of the other proposed changes. LifeBridge then removed the restrictions on additional calls and

10

schedule modifications but retained the restriction on moonlighting. Dr. Kyere again refused to sign the amended employment agreement. During May and June of 2022, LifeBridge repeatedly asked Dr. Kyere to complete and sign various health forms and a "Release Form," along with completing various health assessments.[5] Eventually, after Dr. Kyere protested these requests several times, LifeBridge "agreed not to make [him] undergo any medical evaluation through the Aging Surgeon Program," and instead "proposed Dr. Kyere undergo a medical evaluation by a Neurologist and an Ophthalmologist" and a "functional capacity evaluation."

On August 1, 2022, Dr. Kyere's attorneys asserted that any such evaluation would be unlawful and requested a meeting with LifeBridge's counsel to discuss "final resolution" of the matter. LifeBridge "immediately" asserted its "position that the employment relationship had become irreparable," and that it desired to terminate Dr. Kyere. The parties then negotiated a "formal separation agreement," pursuant to which Dr. Kyere agreed to resign from his employment with LifeBridge, and LifeBridge agreed to close the IPC investigation and not report Dr. Kyere to "any licensing authority or the National Practitioner Databank for resigning during a peer review investigation." Dr. Kyere's employment with LifeBridge ended on September 15, 2022.

---

[5] The Complaint states that "[o]n June 6, 2022, Dr. Kyere initiated the process to file a Charge of Discrimination with" the Equal Employment Opportunities Commission.

## *The Complaint*

As noted earlier, on November 27, 2023, Dr. Kyere filed a ten-count Complaint in the Circuit Court for Baltimore City, naming LifeBridge, the Appellees, and "Unknown Members of the Impaired Practitioner Committee formed Under the Sinai Hospital Medical Staff Bylaws" as defendants. He filed an amended Complaint on December 6 to include further allegations to support the claims asserted. We briefly discuss each of the ten counts in Dr. Kyere's Complaint.

In Count I, Dr. Kyere alleged discrimination under Maryland Code (1984, 2021 Repl. Vol.), State Government Article ("SG") § 20-602, against LifeBridge and the Appellees individually and in their personal capacity. Dr. Kyere alleged that LifeBridge discriminated against him on the basis of his disability in investigating the extent of his condition, including by opening "a formal investigation into Dr. Kyere's health by convening the IPC," and that the IPC further engaged in discrimination by "refus[ing] to act with any objectivity in evaluating any allegations that Dr. Kyere's disability impacted his ability to provide safe patient care." Dr. Kyere further alleged that LifeBridge threatened to terminate him "based on his failure to undergo the overly broad and unlawful medical examination required by the IPC if he did not resign."

In Counts II and III, Dr. Kyere alleged harassment based on disability and unlawful medical inquiry and medical examination in violation of SG § 20-606 and Code of Maryland Regulations ("COMAR") 14.03.02.04, respectively, against LifeBridge as well as the Appellees individually and in their personal capacities. Dr. Kyere explicitly incorporated all preceding allegations in the Complaint into these counts (and all

12

succeeding counts). Counts II and III repeated and re-emphasized many of the same allegations contained in Count I – that LifeBridge and the IPC had demanded he undergo overly broad and invasive medical examinations, which were not focused on determining whether he genuinely had a condition that impaired his ability to safely practice medicine.

Count IV alleged constructive discharge and Count V alleged retaliation. In Count IV, Dr. Kyere alleged that Dr. Durand and LifeBridge had worked together to make "the conditions of Dr. Kyere's employment unbearable" so that he would resign. Dr. Kyere further alleged that LifeBridge had convened the IPC in order to identify "a basis to conclude that he could not provide reliable and safe patient care despite categorical objective evidence proving otherwise." He asserted that LifeBridge ultimately agreed to close the IPC investigation "in exchange for his resignation[,]" and that this amounted to a constructive discharge from his employment. Similarly, in Count V, Dr. Kyere alleged that the IPC had "used its authority and powers under the Medical Staff Bylaws to collude with [LifeBridge] to retaliate against" him after he sought an accommodated work schedule, and that LifeBridge and Dr. Durand further retaliated against him by "attempting to change the terms and conditions of his employment agreement."

In Count VI, Dr. Kyere alleged tortious interference against Dr. Durand individually and in his personal capacity. Dr. Kyere alleged that Dr. Durand, "[a]*s a corporate officer* [of LifeBridge] *acted contrary to the best interest of* [Lifebridge] to retain a skilled physician and induced [LifeBridge] to breach its contact with Dr. Kyere, subjecting it to legal liability to vindicate his personal animus toward Dr. Kyere." (Emphasis added). Moreover, Dr. Kyere posited that the decision to convene the IPC was "[b]ased on

13

information Dr. Durand provided to the President of the Medical Staff," and that Dr. Durand himself had "served as a member of the IPC to inform the decision-making of the IPC." Dr. Kyere insisted that Dr. Durand's actions were taken "outside the scope of his employment with" LifeBridge, with the "improper purpose of causing damage to Dr. Kyere . . . without any justifiable cause."

Count VII alleged breach of the employment agreement against LifeBridge. The allegations in Count VII again revolved around the events resulting from Dr. Kyere's request for a modified schedule, and alleged that "[LifeBridge] was in breach of [the employment agreement] when it attempted to change the terms and conditions of his employment solely because Dr. Kyere exercised his rights under federal and state law to obtain a reasonable accommodation." Count VII also alleged that LifeBridge breached the employment agreement based on "[LifeBridge']s and IPC's demand for . . . an overly broad and unlawful medical examination" in an effort to induce him to resign. According to the Complaint, these breaches of the employment agreement ultimately led to Dr. Kyere's forced resignation.

In Count VIII, Dr. Kyere alleged that LifeBridge and "all defendants, individually and in their personal capacity" violated Dr. Kyere's due process rights and were liable for breach under the Medical Staff Bylaws. Specifically, Dr. Kyere alleged that the IPC was required to recommend "a course of action" with respect to the investigation to the MEC within 30 days of receiving complaints about him, but that neither LifeBridge nor the IPC had made any such recommendation, despite having the authority to do so. Dr. Kyere further alleged that this failure to make a recommendation occurred "under the direction of

14

Dr. Durand and the IPC" and was "done in bad faith to deny Dr. Kyree procedural due process guaranteed to him under the Bylaws."[6]

Count IX alleged gross negligence against the Appellees and five other "unknown members of the IPC," individually and in their personal capacities. Again, Dr. Kyere alleged that the members of the IPC had violated the Bylaws and had been "grossly negligent" in failing to "make any recommendations to the MEC concerning Dr. Kyere[.]" Furthermore, Dr. Kyere alleged that the "IPC members' grossly negligent conduct" was illustrated by their "violation of Maryland statutory provisions which require medical review committees" to act in good faith. Count IX stated, "The IPC's shabby, amateurish,

---

[6] The Bylaws establish internal hearing procedures under Article XII. Article XII(1)(E) provides that:

Within 30 days from the date of the notice set forth in paragraph A of this Section, the affected practitioner may exercise his/her rights under this Article by submitting a written request for a Fair Hearing to the President of the Medical Staff. . . . Failure of the practitioner to timely request a Fair Hearing will be deemed a waiver of his/her right to such hearing and to any appellate review.

Paragraph A states, in relevant part, that "[w]hen the Board of Directors takes Adverse Action . . . with respect to the requested or existing clinical privileges and/or Medical Staff membership of a physician . . . the President of the Hospital shall give prompt written notice of the decision to the involved practitioner." Article XII sets out hearing procedures that include an initial "Fair Hearing" before a "Hearing Officer" or "Hearing Committee." After a hearing, at which all parties may call witnesses and introduce evidence, the hearing officer or committee sends a report and recommendations to the Board of Directors, which, in turn, may affirm, modify, reverse, or refer the matter back for further review. Upon timely request, the Chair of the Board of Directors will appoint an appellate review committee comprised of at least three members of the Board of Directors. "The Credentialing Department will report suspension of clinical privileges to appropriate state and federal agencies after the final determination has been made and agreed upon by the Board of Directors."

15

unprincipled, and unprofessional medical review . . . resulted in the constructive discharge of Dr. Kyere from his employment with" LifeBridge.

Finally, Count X presented a claim of civil conspiracy against LifeBridge and all defendants, asserting that LifeBridge and "Dr. Durand recruited Drs. Zalatimo, Zadzielski, and other unknown persons as members of the IPC to achieve their unlawful and illicit scheme to terminate Dr. Kyere from his employment." Furthermore, Count X asserted that "[a]t all relevant times hereto Drs. Zadzielski, Zalatimo, and other unknown members of the IPC knowingly conspired to aid [LifeBridge] and Dr. Durand to violate Dr. Kyere's rights and breach his employment contract." According to the allegations under this count, LifeBridge used the Medical Staff at the behest of Dr. Durand in order to carry out the conspiracy, and Appellees had all "knowingly conspired to aid" LifeBridge in causing him harm.

### *Motion to Compel Arbitration and Dr. Kyere's Opposition*

On January 5, 2024, LifeBridge and the Appellees filed a motion to compel arbitration and requested a hearing in the circuit court. In support of this motion, they argued that "all claims asserted in" Dr. Kyere's Complaint were covered by the arbitration clause in his employment agreement, given that the clause extended to "any controversy or claim arising out of his employment." LifeBridge and the Appellees argued that there was seemingly "no dispute that the [employment agreement] is a valid agreement," given that Dr. Kyere had sued to enforce it, and he was therefore "estopped from arguing against the validity of the contract." They also argued that the Appellees were "entitled to compel arbitration for the claims made against them" because they were "agents and employees of

16

LifeBridge during the relevant time period." With respect to Count VI of the Complaint, they argued that "the alleged actions of Dr. Durand, which purportedly render him liable for the alleged tort, consist of conduct that is entirely consistent with" his employment by LifeBridge as Dr. Kyere's supervisor, and that "this claim boils down to allegations that [Dr. Kyere] lost his employment because" of actions taken by Dr. Durand in his capacity as an employee of LifeBridge. They asserted that all members of the IPC were agents of Sinai and LifeBridge "by definition," giving them "standing to compel arbitration," and that the claim "falls squarely within the scope of" the arbitration clause.

Dr. Kyere filed an opposition to the motion in which he stated, "[e]ven if this court grants the motion to compel arbitration of Dr. Kyere's breach of contract claims against LifeBridge, the motion to compel should be denied for the remainder of Dr. Kyere's claims against both LifeBridge and Drs. Durand, Zadzielski, and Zalatimo." Dr. Kyere emphasized that the Appellees "are not parties to [his employment] contract, and were not acting as agents of LifeBridge but as members of the Medical Staff, a distinct self-governing body apart from LifeBridge[,]" when they took the actions detailed in his Complaint.

Dr. Kyere acknowledged Appellees' agency relationship with LifeBridge but argued that it did not form the basis of any of his claims against them. Dr. Kyere insisted his claims were based on Appellees' conduct as members of the Sinai Hospital Medical Staff. Although Dr. Kyere's employment agreement was signed by Dr. Durand, Dr. Durand signed the agreement as an agent of LifeBridge and, therefore, the signature was

17

"'not sufficient to bind the agent to arbitrate claims against him personally.'" (Quoting *Curtis G. Testerman Co. v. Buck*, 340 Md. 569, 577 (1995)).

### *Reply and Surreply*[7]

LifeBridge and the Appellees filed a reply on January 30, 2024, in which they refuted Dr. Kyere's contention that they cannot rely on the arbitration provision of the employment agreement because they allegedly acted outside the scope of their agency when they engaged in the conduct that formed the basis of the Complaint. LifeBridge and the Appellees emphasized that "it is a rare circumstance when a trial court can reject a motion to compel arbitration on scope grounds[,]" and that a court may only deny a petition to compel arbitration "when the matter in dispute is <u>unequivocally</u> outside the scope of the arbitration clause[.]" (Quoting *Cont. Constr., Inc. v. Power Tech Ctr. Ltd. P'Ship*, 100 Md. App. 173, 178 (1994) (emphasis added)). They acknowledged that the arbitration clause states that the "authority of the arbitrator will be limited to a determination of the facts, and to the interpretation and application of specific provisions of the" employment agreement, but argued that "[t]he most plausible interpretation" of this language is that "the arbitrator is not permitted to ignore contractual terms" or "impose contractual duties on the parties that are not set out in the" employment agreement. It would be "illogical," in their view, to broadly call for arbitration of "any controversy or claim arising out of [Dr. Kyere]'s

---

[7] The reply and surreply were both submitted along with motions for leave to file them. The circuit court docket does not indicate what action the court took with respect to those motions, but we assume from the fact that both the reply and surreply were docketed that the court granted them.

18

employment" if "contractual claims" were the only types of claims the parties intended to arbitrate. Instead, LifeBridge and the Appellees argued, Dr. Kyere agreed to a broad arbitration clause which, under Maryland law, applies to all claims "unless they are expressly and specifically excluded." (Emphasis in the original). As none of the claims against LifeBridge are expressly excluded, they contended, "it is clear that all of the claims against LifeBridge are" arbitrable.

With respect to the claims against the Appellees specifically, they argued that the Medical Staff is, "in its own right," an agent of LifeBridge, and that all actions taken by the Appellees as members were necessarily within the scope of their agency relationship with LifeBridge. Pointing to various provisions in the Bylaws that direct the Medical Staff to make recommendations for appointments and corrective actions to the Board of Directors, they contended that "the primary function of the Medical Staff is to gather information and make recommendations" to LifeBridge, emphasizing, "[t]his is the act of an agent assisting a principal."

LifeBridge and the Appellees also pointed out that "[t]he majority of claims" against the Appellees were "made jointly [against] LifeBridge." Specifically, they asserted that "the same facts" underpinned the claims against the Appellees as underpinned the claims against LifeBridge in Counts I, II, III, VIII, and X. With respect to Count IX, they asserted that Dr. Kyere's allegations of gross negligence on the part of the members of the IPC were based on the same facts made in many of the other claims in the Complaint, and thus were "inseparable from almost every other count[.]"

19

Dr. Kyere filed a surreply on February 8, in which he contended that LifeBridge has no authority "to direct or control IPC members['] investigation or recommendations" with respect to physicians, and that "[t]he legal principles of agency are antithetical to the notion that Medical Staff members and officers are agents of" LifeBridge. Dr. Kyere also reiterated his argument that the arbitration clause was not broad, but rather only permitted arbitration of "a claim or controversy arising out of the contract which is amenable to adjudication by interpreting 'specific provisions' in the contract."

### *Motions Hearing and Ruling*

The circuit court held a hearing on the motion to compel arbitration on March 18, 2024. The parties generally recycled the arguments they made in their filings, but Dr. Kyere's counsel analogized to *Griggs v. Evans*, 205 Md. App. 64 (2012), stating, "[*j*]*ust as in this case, in the Griggs case there was a broadly worded arbitration agreement* requiring any claim[,] dispute or controversy arising from or related to [the agreement] . . . be resolved through arbitration." (Emphasis added). Counsel explained that under *Griggs,* "broadly worded arbitration agreements trigger a significant relationship test," under which "claims arising under a contract which is transactionally [] related to another contract containing a broadly worded arbitration clause" must bear a significant relationship to the contract containing the clause. Counsel urged that, as in *Griggs,* the court find that there was no significant relationship between the bylaws and the employment agreement because the claims alleged in the Complaint "stem from the [M]edical [S]taff Bylaws which do not contain an arbitration provision."

20

At the conclusion of the hearing, the court began its oral ruling by observing that the arbitration clause in Dr. Kyere's employment agreement is a "broad clause," and accordingly, it would apply the "significant relationship test" as urged by Dr. Kyere's counsel. Then the court noted that the arbitration clause does not say "disputes arising out of this Letter of Agreement. It does not say arising out of this contract." The court highlighted that, instead, the arbitration refers to disputes "'arising out of the doctor's employment' period." Accordingly, the court declared that

> the [c]ourt is satisfied that the plain language of the clause, as broad as it may be, really does cover all of his employment and it's not limited just to what's in the letter of agreement, or lack of a better term, the Contract of Employment. [Dr. Kyere] was subject to, and the hospital staff, are subject to the bylaws.
>
> * * *
>
> The Court finds that there is -- while I appreciate [Dr. Kyere's] counsel's argument that the individually named Defendants were sort of acting in a different role as members of this IPC, as defense counsel pointed out, one is that if you read the complaint, all of the paragraphs do tie together, but even as it relates to – I'm just picking one of the counts -- I think it's IX.
>
> Right. Let's -- looking at IX, I mean, if you read in the count, it talks about Dr. Durand and [LifeBridge], alleged that he may not be able to participate so that there was this sort of -- that they were all working together and then, of course, there's the civil conspiracy count which I don't think that you can avoid that there's an allegation there that this is all obviously significantly related.
>
> So for one, the Court does find that there is a significant relation, that this is not a separate contract, that there is not a separate -- the bylaws in this case are not a separate agreement of sorts for which we could sort of apply a *Griggs* type of analysis and that the individually named [Appellants] were acting within the scope of their duties as employees of Sinai which is the subsidiary, I think, of LifeBridge.

21

The court also held that the interdependent conduct rule applied, such that the Appellees had standing to compel arbitration for Dr. Kyere's claims against them, despite the fact that they did not sign Dr. Kyere's employment agreement in their individual capacities:

> [T]his entire process of which [Dr. Kyere] complains was significantly connected. I mean, it's really all connected, the process that he was forced to go through by the employer and then the agents of the employer, what they put him through and whether or not they were negligent in doing that, whether or not they were tort[i]ous in doing that, or intentional in doing that or grossly negligent in doing that.

The court also held "alternatively" that all of Dr. Kyere's claims were clearly within the scope of the arbitration clause in his employment agreement, regardless of whether these tests applied:

> [M]y ruling here is supported by the fact also that the language, let me make sure I say alternatively, that the language in the arbitration clause, albeit broad, specifically says the employment. It doesn't say the employment contract.

> And all of these things, I think it's undisputed, all of the things for which [Dr. Kyere] complains and all of the counts, even the individual -- claims against the [Appellees] arise directly out of his employment.

The court ruled that all the claims asserted in Dr. Kyere's Complaint must be arbitrated and stayed the case "until [Dr. Kyere] notifies the Court that arbitration has ended or failed." On March 25, 2024, the court entered an order reflecting its ruling. Dr. Kyere filed a notice of appeal on April 3, and as previously noted, he subsequently filed a line withdrawing the appeal as to all claims against LifeBridge. Accordingly, only Dr. Kyere's claims against the Appellees remain for our review.

22

**STANDARD OF REVIEW**

A circuit court's decision to compel arbitration is a legal conclusion, which we review *de novo*. *Holloman v. Circuit City Stores, Inc.*, 391 Md. 580, 588 (2006). Our role "extends only to a determination of the existence of an arbitration agreement." *Ford v. Antwerpen Motorcars Ltd.*, 443 Md. 470, 476 (2015) (quoting *Walther v. Sovereign Bank*, 386 Md. 412, 422 (2005)). "In granting or denying petitions to stay or compel arbitration, courts should not delve into the merits, bona fides or factual basis of the claim to be arbitrated." *Gannett Fleming Inc. v. Corman Construction, Inc.*, 243 Md. App. 376, 390 (2019).

**DISCUSSION**

**A. Parties' Contentions**

Dr. Kyere argues, as he did before the circuit court, that he never agreed to arbitrate any of his claims against the Appellees, and that he only brought claims against the Appellees "in their individual and personal capacity based on conduct they engaged in as officers and members of the Medical Staff and IPC, not as agents of LifeBridge." He contends that the Appellees "are not parties to [his] employment agreement and were not acting as agents of LifeBridge," and asserts that Sinai's "lack of any control over the Medical Staff clearly evidences the lack of any agency relationship" between the Appellees and Sinai. He contends that "the Medical Staff does not act primarily for the benefit of the [Sinai] Board of Directors, but to protect patient safety," which may conflict with the interests of Sinai, and that "the Medical Staff has no powers to enter a contract with third

23

parties on behalf of [Sinai], cannot divest [Sinai] of any ownership interest in any property, and cannot acquire goods, services or other property on behalf of" Sinai.

Dr. Kyere argues that "there is no significant relationship between" his claims against the Appellees and the employment agreement, and that "none of the allegations asserted . . . implicates a breach of a duty arising from his employment agreement." Instead, the Appellees breached the Bylaws and denied him his right to a hearing because the Appellees "never made any recommendations concerning Dr. Kyere's clinical privileges to the MEC." (Emphasis removed).

Dr. Kyere insists that the "tortious and unlawful conduct of Appellees is sufficiently independent of" any conduct by LifeBridge, and that the "facts giving rise to the claims against Appellees are different and independent of the facts giving rise to the claims against LifeBridge." Notwithstanding, he also alleges "Appellees engaged in unlawful conduct by aiding LifeBridge to commit a discriminatory act prohibited by Maryland law[,]" and urges that such "collusion between" the parties is unlawful.

In response, Appellees highlight that every count in Dr. Kyere's Complaint incorporates "*every single* factual allegation that [Dr. Kyere] pled" in preceding counts, and argue that the "same exact conduct is the basis for numerous claims asserted against LifeBridge" and themselves. Therefore, Appellees assert, Dr. Kyere "unambiguously allege[s] that the same facts are relevant to both the claims against LifeBridge and the claims against" themselves, supporting arbitration under the "[i]nterdependent [c]onduct [r]ule." Appellees also stress the fact that Dr. Kyere "asserts a claim for [c]ivil [c]onspiracy

24

between LifeBridge and" themselves in which he alleges that LifeBridge and the Appellees engaged in "concerted action" that gave rise to his lawsuit.

In addition to the interdependent conduct rule, Appellees maintain that they may also compel arbitration as agents of LifeBridge. They point out that "[e]ach of the claims asserted against [them] is significantly related to [Dr. Kyere's] employment relationship." According to Appellees, the claims all arise out of events that occurred during Dr. Kyere's employment with LifeBridge, that the IPC was convened after Dr. Durand – Dr. Kyere's supervisor – received reports about his job performance, and that the IPC's investigation was focused on whether Dr. Kyere could safely perform his job duties. They assert that the "mere fact that [they] were acting as part of the Medical Staff does not mean they were not also acting within their scope of employment" in taking the actions complained of by Dr. Kyere. Appellees contend that the Medical Staff "is plainly an agent, in its own right, of LifeBridge" given that the Bylaws empowered it "only to make recommendations to" LifeBridge and tasked it with "gather[ing] information" and "mak[ing] recommendations for LifeBridge on who should be permitted to work at" Sinai.

Dr. Kyere replies that "an agency relationship, without more," is not a sufficient basis for a non-signatory to an arbitration agreement to compel arbitration, and he reiterates his view that the Medical Staff is not an agent of LifeBridge. He maintains that, even though he alleged that the Appellees and LifeBridge engaged in concerted action as part of his civil conspiracy claim, that concerted action "is not an indispensable element forming the basis of any of Dr. Kyere's other claims against Appellees."

25

## B. Legal Framework

The Supreme Court of Maryland has recognized that "consideration of a motion to compel arbitration may involve two separate, and distinct, issues: (1) whether an agreement to arbitrate exists; and (2) whether a particular dispute falls within the scope of the arbitration agreement." *Access Funding, LLC v. Linton*, 482 Md. 602, 642 (2022). When reviewing a circuit court's decision to compel arbitration, our primary focus must remain squarely on the first issue. *See id.*; *Antwerpen Motorcars*, 443 Md. at 476. This is partly because "[i]n the absence of an express arbitration agreement, no party may be compelled to submit to arbitration in contravention of its right to legal process." *Hartford Accident & Indem. Co. v. Scarlett Harbor Assocs. Ltd.*, 346 Md. 122, 127 (1997) (quoting *Curtis G. Testerman Co. v. Buck*, 340 Md. 569, 579 (1995)).

Additionally, the MUAA, which applies to arbitration agreements between employers and employees that expressly provide for its application, *see* CJP § 3-206; *Bd. of Educ. of Prince George's Cnty. v. Prince George's Cnty. Educ. Ass'n, Inc.*, 309 Md. 85, 96 (1987), embodies a legislative "policy favoring enforcement of arbitration agreements."[8] *Holmes v. Coverall N. Am., Inc.*, 336 Md. 534, 541 (1994). Still, as a party "'cannot be required to submit any dispute to arbitration that it has not agreed to submit[,]'" the determination of whether an agreement to arbitrate exists is a matter of contract

---

[8] In this respect, the MUAA is analogous to the Federal Arbitration Act ("FAA"), which applies to arbitration clauses in agreements involving interstate commerce. Accordingly, in appropriate cases, Maryland courts can rely on decisions interpreting the FAA when interpreting the MUAA. *Holmes*, 336 Md. at 541.

interpretation. *Testerman*, 340 Md. at 579 (quoting *Gold Coast Mall, Inc. v. Larmar Corp.*, 298 Md. 96, 103 (1983)). In *Crown Oil*, Judge Lawrence Rodowsky, building on Judge Rita Davidson's opinion in *Gold Coast Mall,* explained the three types of disputes over the scope of an arbitration clause that come before the courts:

> First, where the language of the arbitration clause is clear, and the dispute in question falls clearly within the provision. Second, where it is clear that "the issue sought to be arbitrated lies beyond the scope of the arbitration clause. . . ." In these two situations the court decides the issue of arbitrability and compels or stays arbitration accordingly. [*Gold Coast Mall*, 298 Md.] at 104[]. In the third class of disputes, "the language . . . is unclear as to whether the subject matter of the dispute falls within the scope of the arbitration agreement." *Id.* at 105[.] *As a general rule, "[w]here there is a broad arbitration clause, calling for the arbitration of any and all disputes arising out of the contract, all issues are arbitrable unless expressly and specifically excluded." Id.* at 104[.] *Thus, in this third class, the Court should promote the legislative policy favoring arbitration and leave the issue of arbitrability to the arbitrators.*

*Crown Oil & Wax Co. of Delaware v. Glen Constr. Co. of Virginia*, 320 Md. 546, 559–60 (1990) (emphasis added). Thus, while "it is initially for the courts to determine whether the subject matter of a dispute falls within the scope of the arbitration clause[,]" we will only do so if the scope of the clause is clear. *Allstate Ins. Co. v. Stinebaugh*, 374 Md. 631, 643 (2003) (citing *Gold Coast Mall*, 298 Md. at 104). "[W]hen the language of an arbitration clause is unclear as to whether the subject matter of the dispute falls within the scope of the arbitration agreement, . . . the question of substantive arbitrability initially should be left to the decision of the arbitrator." *Gold Coast Mall*, 298 Md. at 107; *cf. Gannett Fleming*, 243 Md. App. at 401 (holding that courts should compel arbitration of a dispute unless "the dispute clearly lies beyond the scope of the arbitration clause at issue.").

27

When an arbitration clause broadly calls for the arbitration of any and all disputes arising out of the contract, all disputes are considered to be arbitrable "unless expressly and specifically excluded," thereby "promot[ing] the legislative policy favoring arbitration and leav[ing] the issue of arbitrability to the arbitrators." *Crown Oil*, 320 Md. at 560.

Generally, a valid agreement to arbitrate requires the signature of both the party seeking to compel arbitration and the party against whom arbitration is sought. *See The Redemptorists v. Coulthard Servs., Inc.*, 145 Md. App. 116, 135 (2002). However, as this Court observed in *Griggs v. Evans*, 205 Md. App. 64, 92 (2012), "courts have permitted a non-signatory agent to enforce an arbitration agreement executed by his principal" when the claims asserted against the agent "relate to the agent's actions on behalf of the principal." In enforcing an arbitration agreement signed by its principal, an agent is "subject to the same equitable estoppel framework left to other non[-]signatories." *Id.* at 91 (alteration in original) (quoting *Westmoreland v. Sadoux*, 299 F.3d 462, 467 (5th Cir. 2002)).

The doctrine of equitable estoppel permits a non-signatory to compel arbitration against a signatory in two specific circumstances. First, a non-signatory may compel arbitration against a signatory who relies on the terms of the agreement containing the arbitration clause in asserting its claims, but simultaneously seeks to avoid the terms of the arbitration clause. *Griggs*, 205 Md. App. at 83 (citing *Sunkist Soft Drinks, Inc. v. Sunkist Growers, Inc.*, 10 F.3d 753, 757 (11th Cir. 1993); *Long v. Silver*, 248 F.3d 309, 320 (4th Cir. 2001)). Second, a non-signatory may compel arbitration "when the signatory to the contract containing [an] arbitration clause raises allegations of substantially interdependent

28

and concerted misconduct by both the non[-]signatory and one or more of the signatories to the contract[.]" *Griggs*, 205 Md. App. at 83 (first and second alterations in original) (quoting *Westmoreland v. Sadoux*, 299 F.3d 462, 467 (5th Cir. 2002)). In both cases, the guiding principle is that "it would be unfair 'for a party to rely on [a] contract when it works to its advantage, and repudiate it when it works to its disadvantage.'" *Id.* (alteration in original) (quoting *Wachovia Bank, N.A. v. Schmidt*, 445 F.3d 762, 769 (4th Cir. 2006)).

## C. Analysis

Regardless of whether the substantive claims against the Appellees fall within the scope of the arbitration clause, we cannot conclude that any are arbitrable unless we first determine that there is a valid agreement between Dr. Kyere and the Appellees. *See Hartford*, 346 Md. at 127. As Dr. Kyere points out, none of the Appellees signed his employment agreement in their individual capacity. Ordinarily, this would mean that the Appellees could not compel arbitration of his claims against them. *See The Redemptorists*, 145 Md. App. at 135. Here, under the two-part framework applicable in reviewing a motion to compel arbitration, *Access Funding,* 482 Md. at 642, our analysis of whether Appellees have standing to invoke arbitration under a valid agreement between them and Dr. Kyere (issue one), as well as our analysis of whether the claims in Dr. Kyere's Complaint fall within the scope of that arbitration clause (issue two), are very much intertwined and predicated on the parties' agency relationship and the interdependent conduct alleged in the Complaint.

Dr. Kyere's Complaint explicitly alleges that at "all relevant times," the Appellees were employees of LifeBridge and members of the Medical Staff. Dr. Kyere's allegations

29

all concern actions taken within Appellees' capacity as members of the Medical Staff, while subject to the control of Sinai and LifeBridge. Dr. Kyere emphasizes that the Appellees, like himself, are members of the Medical Staff. However, Appellees, like Dr. Kyere, are only members of the Medical Staff because they are all employees of LifeBridge. As Appellees argue in their brief, "the mere fact that [Appellees] were acting as part of the Medical Staff does not mean they were not also acting within their scope of employment."

Dr. Kyere emphasizes that the Medical Staff is a distinct legal entity from Sinai and LifeBridge. Although this is true, the Medical Staff is also clearly subject to the control of Sinai and LifeBridge. This is evidenced by numerous provisions of the Bylaws – for instance, the Board of Directors of Sinai has the ultimate authority on "[i]nitial appointments and reappointments to the Medical Staff[;]" approval of the "clinical privileges" granted to members of the Medical Staff; and all suspensions, expulsions, limits and other corrective actions taken "with regard to a practitioner's clinical privileges or Medical Staff membership." The Medical Staff may handle many of the particulars of governing a physician's clinical privileges at Sinai, but control of those clinical privileges rests with Sinai itself. This is the hallmark of an agency relationship – indeed, "[i]t is the element of continuous subjection to the will of the principal which distinguishes the . . . agency agreement from other agreements." *Schear v. Hotel Mgmt. Corp. of Am.*, 61 Md. App. 670, 687 (1985) (alterations in original) (quoting Restatement (Second) of Agency § 1 cmt. b (Am L. Inst. 1958)). Even setting aside Appellees' employment relationship with LifeBridge, Dr. Kyere's allegations that the Appellees conspired with

LifeBridge to cause him harm support our conclusion that they acted as agents of LifeBridge. *Cf. Mackey v. Compass Mktg., Inc.*, 391 Md. 117, 142 (2006) (in discerning the meaning of "agent" under Maryland's long-arm statute, the Supreme Court observed that "[a]s a matter of substantive law, a conspirator who performs an act in furtherance of the conspiracy does so as an agent for his co-conspirators.").

In short, we are not persuaded by Dr. Kyere's argument that Appellees cannot invoke the arbitration clause because they were acting outside the scope of their agency. We hold that the Appellees are covered under the terms of the arbitration clause in Dr. Kyere's employment agreement because the claims against them are based on acts they allegedly committed as employees and agents of LifeBridge within the agency relationship that exists between Medical Staff and LifeBridge. *See Pritzker v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 7 F.3d 1110, 1121 (3d Cir. 1993) ("Because a principal is bound under the terms of a valid arbitration clause, its agents, employees, and representatives are also covered under the terms of such agreements.").

The "equitable estoppel framework" for non-signatories also provides the Appellees a clear basis to compel arbitration of Dr. Kyere's claims against them. *Griggs*, 205 Md. App. at 91. Dr. Kyere's Complaint is saturated with "allegations of substantially interdependent and concerted misconduct" between the Appellees and LifeBridge. *Id.* at 83 (quoting *Westmoreland v. Sadoux*, 299 F.3d 462, 467 (5th Cir. 2002)). The basic factual picture sketched by the Complaint is that, in response to Dr. Kyere's request for a modified work schedule, LifeBridge and the Appellees worked together to harass, discriminate against, and intimidate him until he agreed to resign. Indeed, in Count X, Dr. Kyere

31

explicitly alleges that the same actions which underpin every other count in the Complaint were undertaken as part of a conspiracy between LifeBridge and the Appellees to violate his rights and breach the employment agreement. The other nine counts in the Complaint are essentially "based on the same facts," and incorporate allegations of an "inherently inseparable" series of actions taken by the Appellees and LifeBridge. *Id.* at 86. Even where Dr. Kyere alleges individual legal violations – such as Count VI's claim of tortious interference against Dr. Durand, or Count IX's claim of gross negligence against each of the Appellees – the conduct underpinning those violations is undeniably intertwined with the alleged misconduct of LifeBridge. Accordingly, we conclude that the Appellees have standing to compel arbitration of the claims against them under the employment agreement's arbitration clause.

Having determined that an agreement to arbitrate exists between Dr. Kyere and Appellees and that Appellees have standing to compel arbitration, we now consider whether Dr. Kyere's claims against the Appellees all fall within the *scope* of the arbitration clause. *Access Funding,* 482 Md. at 642. Dr. Kyere argues that because his claims against the Appellees are either based on breaches of the Bylaws or on independent violations of Maryland law, they fall outside the arbitration clause's scope. He notes, for example, that the arbitrator's authority is "limited to a determination of the facts, and to the interpretation and application of specific provisions of the" employment agreement, which suggests that the clause anticipates only arbitration concerning breaches of the employment agreement.

We agree with the circuit court's finding that the arbitration clause, by its terms, covers "any controversy or claim arising out of [Dr. Kyere]'s employment[,]" and not just

32

claims arising out of his employment *agreement*. As we have detailed above, the Complaint consists entirely of alleged conduct that was related to Dr. Kyere's employment with LifeBridge.

We also agree with the circuit court that the arbitration clause is broad, covering "any controversy or claim arising out of [Dr. Kyere]'s employment," and that there is nothing in the arbitration clause that "expressly and specifically exclude[s]" any of Dr. Kyere's claims against the Appellees from arbitration. *Gold Coast Mall*, 298 Md. at 104. However, we also recognize that the arbitration clause specifies that, "[t]he authority of the arbitrator will be limited to a determination of the facts, and to the *interpretation and application of specific provisions of the physician's Letter of Agreement and this document* as they may apply to the issue." (Emphasis added). The arbitrability of a claim "turns on the factual allegations encompassed" in that claim, rather than "the legal causes of action" asserted. *The Redemptorists v. Coulthard Servs., Inc.*, 145 Md. App. 116, 151 (2002). To the extent that the factual allegations encompassed in any claim in Dr. Kyere's Complaint create ambiguity as to whether the Letter of Agreement and the Standard Terms apply to that claim, then under the *Crown Oil* framework, the arbitrability of that claim must be addressed by the arbitrator, not the court. *Crown Oil,* 320 Md. at 559–60; *Gold Coast Mall*, 298 Md. at 107 (holding that "the court should not deprive the party seeking arbitration of the arbitrator's skilled judgment by attempting to resolve" ambiguities in an arbitration agreement).

A similar issue was presented to this Court in *Gannett Fleming, Inc. v. Corman Construction, Inc.*, 243 Md. App. 376, 389 (2019). There, the question was whether a

33

claim "fell within the substantive scope of the arbitration provision in the Design Subcontract.[.]" *Id.* Gannett Fleming argued that the claim was not subject to arbitration under the Design Subcontract because it related solely to the provisions of a separate Teaming Agreement, which contained no arbitration provision. *Id.* at 400. We noted that the "arbitration clause in the Design Subcontract is broadly worded, leaving vague the precise bounds of its scope." *Id.* at 403. Still, we held that "because the scope of the arbitration agreement extends to all disputes relating to the Design Subcontract or its breach, and because 'any doubt over arbitrability should be resolved in favor of arbitration,' we cannot say the dispute is not arbitrable on substantive grounds." *Id.* at 405 (internal citation omitted).

As in *Gannett Fleming, Inc.*, we will not rely on the *Griggs* significant relationship test in determining arbitrability of the claims. *See id*. at n.11. The *Griggs* test provides that "'when a "significant relationship" exists between the asserted claims and the contract in which the arbitration clause is contained,' those *claims must* be submitted to arbitration." *Griggs*, 205 Md. App. at 77 (quoting *Long*, 248 F.3d at 316) (emphasis added). Unlike the interdependent conduct rule, the focus of the *Griggs* test is on the claims themselves, rather than the general standing to compel arbitration of the individual against whom they are brought. Just as in *Gannett Fleming*, the arbitration clause in this case is broadly worded and governed by the MUAA, whereas in *Griggs*, the arbitration clause fell under the Federal Arbitration Act. *Griggs*, 205 Md. App. at 75. Under the Supreme Court of Maryland's approach to arbitrability, as presented in *Gold Coast Mall* and *Crown Oil*, when it is unclear whether particular claims fall within the scope of an arbitration agreement, the

34

determination of arbitrability of the claims must be left to the skilled judgment of the arbitrator. *Allstate Ins. Co. v. Stinebaugh*, 374 Md. 631, 643 (2003). Here, the arbitrator may, at the outset of arbitration, address any questions about whether the factual allegations encompassed in any particular claim(s) render the claim(s) outside the scope of the arbitration clause.

In sum, we hold that the circuit court did not err in granting Appellees' Motion to Compel Arbitration. The Appellees had standing to compel arbitration under the arbitration clause because Dr. Kyere alleged that LifeBridge and the Appellees had engaged in substantially interdependent and concerted misconduct, and because the claims against them are based on acts they allegedly committed as employees and agents of LifeBridge within the agency relationship that exists between Medical Staff and LifeBridge. We also construe the arbitration clause as "broadly worded, leaving vague the precise bounds of its scope" over various claims. *Gannett Fleming* 243 Md. App. at 403. Consequently, although we conclude that none of Dr. Kyere's claims against the Appellees were clearly "beyond the scope of the arbitration clause at issue," *Gannett Fleming* 243 Md. App. at 401, any questions about the arbitrability of specific claims in Dr. Kyere's Complaint may be resolved by the arbitrator.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED; COSTS TO BE PAID BY APPELLANT.**